Lloyd KNOTTS; and Jackie Knotts, Appellants,

v.

ZURICH INSURANCE COMPANY; Zurich American Companies; and Zurich American Insurance Company of Illinois, Appellees.

No. 2004–SC–0400–DG.

Supreme Court of Kentucky.

May 18, 2006.

Rehearing Denied Aug. 24, 2006.

**26.** *Id.* at 802.

Larry B. Franklin, Franklin & Hance, Lee E. Sitlinger, Sitlinger, McGlincy, Steiner, Theiler & Karem, Louisville, Counsel for Appellants.

James Douglas Harris, Jr., Wyatt, Tarrant & Combs, Bowling Green, Robert E. Stopher, Boehl, Stopher & Graves, Louisville, Counsel for Appellees.

Douglas Hoots, Tyler Griffin Smith, Landrum & Shouse, Lexington, Counsel for Amicus Curiae, the Insurance Institute of Kentucky, State Auto Insurance Companies, State Farm Insurance Companies.

Carl D. Frederick, Paul Joseph Hershberg, Seiller & Handmaker, Louisville, Counsel for Amicus Curiae, the Kentucky Academy of Trial Attorneys.

Eugene R. Anderson, Anderson, Kill & Olick, New York, NY, Amy Bach, Mill Valley, CA, M. Austin Mehr, Timothy E. Geertz, Austin Mehr Law Offices, Lexington, Counsel for Amicus Curiae, United Policyholders.

ROACH, Justice.

## I. Introduction

Appellant, Lloyd Knotts, was seriously injured in a construction accident while performing construction work under a contract for a company. He initiated a claim with the company's insurer and later filed

a personal injury action against the company. He subsequently filed a bad-faith suit against the company's insurer for violations of Kentucky's Unfair Claims Settlement Practices Act (UCSPA). The suit included allegations of violations that occurred after the filing of his personal injury action. The lower courts rejected Knotts's bad faith claim on grounds that the UCSPA is inapplicable to an insurance company's conduct that occurs after the commencement of an underlying tort action. Because we hold that the UCSPA continues to apply during litigation, we reverse.

## II.  Background

In November 1992, Lloyd Knotts, a self-employed construction contractor, contracted with Lawson Mardon Flexible, Inc.[1] to build an "aging room" at the company's warehouse in Shelby County. On November 12, 1992, Knotts was working with an electric drill atop a thirty-foot high platform. The drill drew power through an extension cord that was tethered to the platform and ran across the warehouse floor to an electrical outlet. At the same time, Brian Lovings, a temporary employee of Lawson Mardon, was operating a forklift in the vicinity of the platform. As Lovings drove past the platform, the extension cord caught on the fork of the forklift, causing the platform to topple and Knotts to fall. Knotts suffered serious, permanent injuries and incurred significant medical expenses as a result. At the time of the accident, Lawson Mardon had a policy of general liability insurance with Zurich American Insurance Group.[2]

Knotts employed an attorney, Larry Franklin, who advised Lawson Mardon that he would be representing Lloyd Knotts and his wife. In his initial letter, dated November 30, 1992, Franklin asked Lawson Mardon to cover Knotts's medical expenses, future therapy, and full payment for the job he was performing when injured. The letter also stated: "After Mr. Knotts reaches maximum medical improvement, we will negotiate conclusion of this matter. If this proposal is not satisfactory to you, please let us know so we can proceed with litigation."

Lawson Mardon referred the matter to its insurer, Zurich, which began the claims adjustment process. On December 10, 1992, Zurich wrote Franklin a letter acknowledging his representation of Knotts. The letter also stated, in pertinent part:

> We are in the initial stage of our investigation of this accident. Therefore, . . . we are not in a position to discuss liability. However, we must advise you we do not find this to be a workers compensation exposure, as outlined by the Kentucky Workers Compensation Act. Thus, as we are not Mr. Knott's [sic] workers compensation carriers, we cannot make payment of his medical expenses as you requested in your[ ] [letter] of November 30.
>
> Naturally, once we have completed our investigations, we will be in further contact with you.

On December 18, 1992, Franklin wrote a letter to Knotts that read simply: "I recommend beginning suit right away. It looks like they are going to stall us." On January 14, 1993, Knotts filed suit in Shel-

---

1.  At the time of the accident, the company was called Alusuisse Flexible Packaging, Inc. Because the name has since changed, we will employ the company's current name, Lawson Mardon Flexible, Inc.

2.  This moniker appears to be an umbrella name used by the Appellees—Zurich Insurance Company, Zurich American Companies, and Zurich American Insurance Company of Illinois—to whom we refer collectively hereinafter as "Zurich."

by Circuit Court. At trial, the jury rendered a verdict in favor of Knotts and awarded him damages of $1,202,104.29, reduced by 20% after apportionment of fault for Knotts's own negligence. The Court of Appeals affirmed.

Knotts subsequently pursued a bad faith claim against Zurich. Specifically, Knotts claimed that Zurich had violated Kentucky's UCSPA, KRS 304.12–230, in the course of litigating the underlying tort case and the resulting appeal. The trial court granted a summary judgment in favor of Zurich, holding that KRS 304.12–230 applied only to an insurer's conduct before the commencement of litigation. The Court of Appeals affirmed, and we granted discretionary review.

### III. Analysis

Zurich urges us to affirm the trial court and the Court of Appeals, both of which held that the duty of good faith and fair dealing imposed on an insurer by KRS 304.12–230 ends at the commencement of a tort action for which a claim under the insurance policy has been made. While such an approach has some instinctive appeal, especially given that the adversarial nature of litigation undoubtedly makes it difficult for an insurer to fulfill such a demanding duty to what amounts to an opposing party, we ultimately find that the statute simply cannot be read in such a limited manner.

KRS 304.12–230 imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured or to another person bringing a claim under an insurance policy. However, the statute does not lay out an amorphous, non-specific duty. Instead, it proscribes a list of particular acts and practices. The statute specifically provides the following:

It is an unfair claims settlement practice for any person to commit or perform any of the following acts or omissions:

(1) Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue;

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;

(5) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed;

(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(7) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;

(8) Attempting to settle a claim for less than the amount to which a reasonable man would have believed he was entitled by reference to written or printed advertising material accompanying or made part of an application;

(9) Attempting to settle claims on the basis of an application which was altered without notice to, or knowledge or consent of the insured;

(10) Making claims payments to insureds or beneficiaries not accompanied by statement setting forth the coverage

under which the payments are being made;

(11) Making known to insureds or claimants a policy of appealing from arbitration awards in favor of insureds or claimants for the purpose of compelling them to accept settlements or compromises less than the amount awarded in arbitration;

(12) Delaying the investigation or payment of claims by requiring an insured, claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

(13) Failing to promptly settle claims, where liability has become reasonably clear, under one (1) portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage;

(14) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement; or

(15) Failing to comply with the decision of an independent review entity to provide coverage for a covered person as a result of an external review in accordance with KRS 304.17A–621, 304.17A–623, and 304.17A–625.

KRS 304.12–230.

Zurich argues that the use of the word "claim" in the statute means a pre-litigation, adjustable claim made against the insurance policy, thus the statute does not apply to any acts or omissions by the insurer after litigation commences. However, Zurich's argument fails from too narrow a reading of the word "claim." Like many words, "claim" is subject to multiple, subtly different definitions. *See, e.g.,* *Black's Law Dictionary* 264 (8th ed.2004) (defining "claim" as: "1. The aggregate of operative facts giving rise to a right enforceable by a court <the plaintiff's short, plain statement about the crash established the claim>.—Also termed *claim for relief.* 2. The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional <the spouse's claim to half the lottery winnings>. 3. A demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for.... 4. An interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; CAUSE OF ACTION (1) <claim against the employer for wrongful termination>."). But at its most basic, the word means an assertion of a right, with the contours and specific nature of the right depending on context.

■ This general use is applicable to KRS 304.12–230. The "right" being asserted arises under the insurance policy and is the right to compensation for injuries for which liability has been established. Thus, "claim," as used in the statute, means an assertion of a right to remuneration under an insurance policy once liability has reasonably been established. This is usually done by making the claim directly to the insurance company, which then engages in the claim adjustment process. But it may also be accomplished by instituting litigation, which is simply another means of asserting the right under the insurance policy. Though litigation is distinct from the claims adjustment process in that it specifically invokes the courts' power to decide the issue of liability, both procedures are simply methods of pursuing claims under an insurance policy. It is often the case that both methods are em-

ployed, with litigation following (or preempting) the claim adjustment process.

■ The commencement of litigation by the filing of a complaint, even when the claim adjustment process is underway, however, does not change the fundamental nature of what the claimant seeks. The "claim"—for compensatory payment under the insurance policy—is the same as before the litigation began. The claimant has simply opted to seek satisfaction of the claim through a different procedure. Nothing in KRS 304.12–230 limits its applicability to pre-litigation conduct, and since the statute applies to "claims," it continues to apply to an insurer so long as a claim is in play. As such, we hold that KRS 304.12–230 applies both before and during litigation.

Though the statute's language is clear, we also note that this reading is consistent with the public policy underlying the statute. *See State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky.1988) ("The Kentucky law is similar to those adopted by thirty-eight other states and is based on the 1971 amendment that the National Association of Insurance Commissioners made to its model 'act relating to unfair methods of competition and unfair and deceptive acts and practices in the business of insurance.' This statute is intended to protect the public from unfair trade practices and fraud. It should be liberally construed so as to effectuate its purpose."). If KRS 304.12–230 were not applicable once litigation commenced, insurance companies would have the perverse incentive to spur injured parties toward litigation, whereupon the insurance company would be shielded from any claim of bad faith. Such a reading would undermine the statute's fundamental purpose by allowing insurance companies to engage in whatever sort of practice—fair or unfair— they see fit to employ. The remedial na-

ture of the statute requires that we attempt to effectuate its purpose, which, in a situation like this one, requires applying the statute to conduct occurring after the commencement of litigation of a tort action.

We also note that this approach is consistent with that of almost every other jurisdiction to have addressed the issue. Those courts have consistently held that the duty of good faith, whether an inherent aspect of the insurance contract or a statutory construct, continues during any litigation that is brought to determine liability for the underlying tort. *See, e.g., White v. Western Title Ins. Co.*, 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 316–17 (1985) (holding that the duty of good faith continues during litigation because the contractual relationship continues); *Haddick v. Valor Ins.*, 315 Ill.App.3d 752, 248 Ill.Dec. 812, 735 N.E.2d 132, 133 (2000) ("We reverse and hold that an insurance company has a duty to act in good faith in settling a claim against its policyholder in a timely manner both before and after suit is filed."); *Harris v. Fontenot*, 606 So.2d 72, 74 (La.Ct.App.1992) ("We first note that nowhere in either statute is there an express distinction limiting the application to the pre-litigation conduct of the insurer. . . . [W]e believe that it is clear that the statute was enacted to impose a requirement of good faith and fair dealing on the insurer, requirements that are no less important after litigation has begun as before."); *Palmer v. Farmers Ins. Exchange*, 261 Mont. 91, 861 P.2d 895, 913 (1993) ("[A]n insurer's duty to deal fairly and not to withhold payment of valid claims does not end when an insured files a complaint against the insurer."); *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa.Super.Ct.1999) ("[W]e refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the

insured."); *Barefield v. DPIC Companies, Inc.*, 215 W.Va. 544, 600 S.E.2d 256, 267 (2004) ("We therefore must conclude that the language of the UTPA does not restrict the scope of the conduct that is proscribed by the Act to that which occurred prior to the filing of a lawsuit.").

Other jurisdictions, while not expressly addressing the issue of the viability of the duty of good faith after litigation, have implicitly approved the concept by allowing admission of evidence of the insurance company's conduct that occurred after the commencement of litigation. *See, e.g., T.D.S. Inc. v. Shelby Mut. Ins. Co.*, 760 F.2d 1520, 1527 (11th Cir.1985) (applying Florida law: "Certainly the litigation conduct of [the insurer] was relevant to the claim that [the insurer] or those acting on its behalf dealt dishonestly with [insured]."); *Southerland v. Argonaut Ins. Co.*, 794 P.2d 1102, 1106 (Colo.Ct.App.1990) (holding that admission of evidence of post-filing conduct was not an abuse of discretion because the evidence helped establish a habitual pattern of dealing with the plaintiff); *Home Ins. Co. v. Owens*, 573 So.2d 343, 344 (Fla.Dist.Ct.App.1990) ("[W]e concur with the Eleventh Circuit Court of Appeals. In *T.D.S. Inc. v. Shelby Mutual Insurance Co.*, 760 F.2d 1520 (11th Cir.1985), ... a bad faith case, the court held that the insurance company's litigation conduct was admissible, relevant evidence."); *Spadafore v. Blue Shield*, 21 Ohio App.3d 201, 486 N.E.2d 1201, 1204 (1985) ("[E]vidence of the breach of the insurer's duty to exercise good faith occurring after the time of filing suit is relevant so long as the evidence related to the bad

faith or handling or refusal to pay the claim."). *But see Parker v. Southern Farm Bureau Cas. Ins.*, 326 Ark. 1073, 935 S.W.2d 556, 562 (1996) (stating that "none of the conduct by Farm Bureau after the filing of the complaint, including legal positions asserted, can provide a basis for Parker's bad-faith claim"); *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 257 (Wyo.2000) (holding that post-filing conduct is controlled by the Rules of Civil Procedure and disallowing the bad faith claim based on such conduct).

█ Recognizing the existence of a continuing duty of good faith, however, is not the end of our inquiry. We must also address the further question of what sorts of post-filing conduct by an insurer will be admissible in a bad faith action. This is truly an issue of first impression in this state, so we turn to other jurisdictions for guidance. Treatment of this issue can be divided broadly into two camps: (1) allowing only evidence of the insurance company's settlement behavior and (2) allowing that evidence plus evidence of the litigation tactics, strategies, and techniques employed on behalf of the insurance company.[3]

The first approach appears to have developed initially in California, beginning with *White v. Western Title Insurance Co.*, 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309 (1985), which is considered the seminal case in this area of the law. In *White*, the California Supreme Court held that the admission of low "settlement offers and other matters occurring after commencement of litigation" could be used to prove

---

**3.** There actually is a third approach, namely a blanket prohibition of the admission of post-filing conduct. Arkansas and Wyoming are representative of this rule. *Parker v. Southern Farm Bureau Cas. Ins.*, 326 Ark. 1073, 935 S.W.2d 556, 562 (1996); *Roussalis v. Wyoming Medical Center, Inc.*, 4 P.3d 209, 257 (Wyo.2000). This approach, however, amounts to the denial of the continuing existence of a duty of good faith once litigation begins. Because our statute applies both before and during litigation, we need not address this approach any further.

bad faith. *Id.* at 316. The court declined a blanket exclusion of all litigation strategy, noting that while it was cognizant of the insurance company's fear that jurors would not be able to distinguish between legitimate, though aggressive, litigation techniques and actual bad faith, it nonetheless "trust[ed] that the jurors will be aware that parties to a lawsuit are adversaries, and will evaluate the insurer's conduct in relation to that setting." *Id.* at 317. The court also noted that "[t]he trial court ... would retain the authority to exclude evidence of settlement offers or other conduct of the insurer if it concluded that in the case before it the prejudicial effect of such evidence would outweigh its probative value." *Id.* at 317 n. 9.

Since *White,* however, California's courts have not accepted the invitation to allow broader evidence of post-filing conduct. In fact, California courts have sharply limited the application of *White* so as to prohibit admission of evidence of the vast majority of post-filing conduct, namely, litigation techniques and strategies. As one California appellate court has noted, "*White* stands for the proposition that ridiculously low statutory offers of settlement may be introduced . . . . as bearing on the issue of bad faith of the insurance company." *California Physicians' Service v. Superior Court,* 9 Cal.App.4th 1321, 12 Cal.Rpt.2d 95, 100 (1992). That same court further held:

> Defensive pleading, including the assertion of affirmative defenses, is communication protected by the absolute litigation privilege. Such pleading, even though allegedly false, interposed in bad faith, or even asserted for inappropriate purposes, cannot be used as the basis for allegations of ongoing bad faith. No complaint can be grounded upon such pleading.

*Id.; see also Nies v. National Auto. & Casualty Ins. Co.,* 199 Cal.App.3d 1192, 245 Cal.Rptr. 518 (Cal.Ct.App.1988) (holding that insurers will be disabled from conducting a vigorous defense in a bad faith insurance action if their pleadings may be used to prove pre-existing bad faith); *Tomaselli v. Transamerica Ins. Co.,* 25 Cal.App.4th 1766, 31 Cal.Rptr.2d 224, 228 (1994) (claim for bad faith cannot be based on an insurer's appeal from an adverse judgment). In essence, California's approach has evolved to allow the introduction of unreasonable settlement behavior (specifically, low settlement offers) that occurs after suit has been filed while prohibiting the admission of litigation conduct, techniques, and strategies.

The other approach, though it pays lip-service to limiting the evidence of post-filing conduct, allows the introduction of litigation strategies and techniques as evidence of bad faith on the part of an insurance company. *See Barefield v. DPIC Companies, Inc.,* 215 W.Va. 544, 600 S.E.2d 256, 271 (2004) (allowing the introduction of evidence of alleged misconduct by defense counsel during litigation, so long as the insurer knowingly encourages, directs, participates in, relies upon or ratifies such alleged wrongful conduct); *Home Ins. Co. v. Owens,* 573 So.2d 343, 344 (Fla. Dist.Ct.App.1990) (upholding admission of evidence of an insurer's pleadings as well as the insurer's failure to answer a request for admissions).

This permissive approach is unappealing for a variety of reasons, the most compelling of which have been addressed extensively by the Montana Supreme Court. *Palmer v. Farmers Ins. Exchange,* 261 Mont. 91, 861 P.2d 895 (1993). Specifically, the court explained the overriding policy rationale for excluding evidence of litigation strategies and techniques and generally limiting evidence of

an insurance company's post-filing behavior:

> Courts have held, and we agree, that an insurer's duty to deal fairly and not to withhold payment of valid claims does not end when an insured files a complaint against the insurer. *See, e.g., White v. Western Title Ins. Co.* (1985), 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 317. Several courts have considered whether evidence of an insurer's conduct during litigation of the underlying suit is admissible in a subsequent bad faith action. After examining the reasoning of courts that have considered the issue, we conclude that the continuing duty of good faith does not necessarily render evidence of an insurer's post-filing conduct admissible. *See Palmer v. Ted Stevens Honda, Inc.* (1987), 193 Cal. App.3d 530, 238 Cal.Rptr. 363, 366–69; *White,* 221 Cal.Rptr. at 517, 710 P.2d at 317 (as interpreted by both *Nies v. National Auto. & Casualty Ins. Co.* (1988), 199 Cal.App.3d 1192, 245 Cal.Rptr. 518, 523–25, and *California Physicians' v. Superior Ct.* (1992), 9 Cal.App.4th 1321, 12 Cal.Rptr.2d, 95, 99–100). Indeed, courts rarely should allow such evidence and we have adopted a balancing test for those rare circumstances.

Public policy favors the exclusion of evidence of an insurer's post-filing litigation conduct in at least two respects. First, permitting such evidence is unnecessary because during the initial action, trial courts can assure that defendants do not act improperly. Next, and more importantly, the introduction of such evidence hinders the right to defend and impairs access to the courts.

The Rules of Civil Procedure control the litigation process and, in most instances, provide adequate remedies for improper conduct during the litigation process. Once the parties have assumed adversarial roles, it is generally for the judge in the underlying case and not a jury to determine whether a party should be penalized for bad faith tactics. *Ted Stevens Honda,* 193 Cal.App.3d 530, 238 Cal.Rptr. 363, 369, (citing *White,* 221 Cal.Rptr. at 525, 710 P.2d at 325 (Lucas, J., concurring and dissenting)).

An attorney in litigation is ethically bound to represent the client zealously within the framework provided by statutes and the Rules of Civil Procedure. These procedural rules define clear boundaries of litigation conduct. If a defense attorney exceeds the boundaries, the judge can strike the answer and enter judgment for the plaintiff, enter summary judgment for the plaintiff, or impose sanctions on the attorney. See *White,* 221 Cal.Rptr. at 525, 710 P.2d at 325, (Lucas, J., concurring and dissenting). There is no need to penalize insurers when their attorneys represent them zealously within the bounds of litigation conduct. To allow a jury to find that an insurer acted in bad faith by zealously defending itself is to impose such a penalty.

The most serious policy consideration in allowing evidence of the insurer's post-filing conduct is that it punishes insurers for pursuing legitimate lines of defense and obstructs their right to contest coverage of dubious claims. As discussed below, if defending a questionable claim were actionable as bad faith, it would impair the insurer's right to a zealous defense and even its right of access to the courts.

Allowing evidence of litigation strategies and tactics would expose the insurer's entire defense in a coverage action to scrutiny by the jury, unless the insurer won the underlying suit. The jury then, with the assistance of hindsight, and without the assistance of insight into litigation techniques, could "second

guess the defendant's rationales for taking a particular course." *White*, 221 Cal.Rptr. at 524, 710 P.2d at 324 (Lucas, J., concurring and dissenting). In addition, the jury could consider evidence of the defendant's litigation strategy and tactics without any showing that the insurer's conduct was technically improper. Thus, insurers would be reluctant to contest coverage of questionable claims.

The case at hand exemplifies the warning given by Justice Lucas in his dissent to *White*. Justice Lucas warned that permitting evidence of the post-filing conduct of the insurer's attorneys would allow juries to impose liability for litigation tactics which are in and of themselves proper, merely because a jury may conclude that the strategy and tactics in and of themselves amounted to bad faith. See *White*, 221 Cal.Rptr. at 523–24, 710 P.2d at 323–24 n. 4 (Lucas, J., concurring and dissenting).

In this case, as in *White*, the plaintiff did not contend that insurer's tactics in and of themselves were improper, rather the implicit claim was that the litigation strategy and tactics amounted to bad faith. The jury was allowed to consider Farmers' legitimate defense strategy and proper litigation tactics as evidence of bad faith, when the relevant inquiry should have been whether Farmers' had a reasonable basis for denying the claim.

To permit evidence of insurers' litigation strategies and tactics is to impede insurers' access to the courts and right to defend, because it makes them reluctant to contest coverage of questionable claims. "Free access to the courts is an important and valuable aspect of an effective system of jurisprudence, and a party possessing a colorable claim must be allowed to assert it without fear of suffering a penalty more severe than typically imposed on defeated parties." *White*, 221 Cal.Rptr. at 524, 710 P.2d at

324 (Lucas, J., concurring and dissenting) (quoting *Young v. Redman* (Cal. App.1976), 55 Cal.App.3d 827, 128 Cal. Rptr. 86, 93). Public policy dictates, therefore, that courts must use extreme caution in deciding to admit such evidence even if it is relevant to the insurer's initial decision to deny the underlying claim.

This brings us to another crucial point, the relevance of the insurer's post-filing conduct. In general, an insurer's litigation tactics and strategy in defending a claim are not relevant to the insurer's decision to deny coverage. Indeed, if the insured must rely on evidence of the insurer's post-filing conduct to prove bad faith in denial of coverage, questions arise as to the validity of the insured's initial claim of bad faith. One court has gone so far as to hold that "once litigation has commenced, the actions taken in its defense are not, in our view, probative of whether defendant in bad faith denied the contractual lawsuit." *Ted Stevens Honda*, 238 Cal. Rptr. at 368.

After the onset of litigation, an insurer begins to concentrate on supporting the decisions that led it to deny the claim. The insurer relies heavily on its attorneys using common litigation strategies and tactics to defend against a debatable claim. Consequently, actions taken after an insured files suit are at best marginally probative of the insurer's decision to deny coverage. *See* Randy Papetti, Note, *Insurer's Duty of Good Faith in the Context of Litigation*, 60 Geo.Wash.L.Rev.1931, 1972 (1992).

In some instances, however, evidence of the insurer's post-filing conduct may bear on the reasonableness of the insurer's decision and its state of mind when it evaluated and denied the underlying

claim. Therefore, we do not impose a blanket prohibition on such evidence. *Id.* 913–15. Similar policy concerns have driven the decisions in a number of other jurisdictions to prohibit the introduction of litigation strategy and techniques. *See, e.g., Timberlake Const. Co. v. U.S. Fidelity and Guar. Co.,* 71 F.3d 335, 340–41 (10th Cir.1995) ("Allowing litigation conduct to serve as evidence of bad faith would undermine an insurer's right to contest questionable claims and to defend itself against such claims ... [P]ermitting allegations of litigation misconduct would have a chilling effect on insurers, which could unfairly penalize them by inhibiting their attorneys from zealously and effectively representing their clients within the bounds permitted by law. Insurers' counsel would be placed in an untenable position if legitimate litigation conduct could be used as evidence of bad faith. Where improper litigation conduct is at issue, generally the Federal Rules of Civil Procedure provide adequate means of redress, such as motions to strike, compel discovery, secure protective orders, or impose sanctions."); *Sims v. Travelers Insurance Co.,* 16 P.3d 468 (Okla.Civ.App.2000) (specifically adopting *Timberlake*'s rule disallowing use of litigation conduct and strategy); *O'Donnell ex rel. Mitro v. Allstate Ins. Co.,* 734 A.2d 901, 908–09 (Pa.Super.Ct.1999) (prohibiting the introduction of evidence of improper discovery techniques). Those policy concerns are equally at play under Kentucky law.

We recognize that Montana's Supreme Court has since retreated from what had appeared to be a strict rule against allowing the introduction of litigation conduct by an insurer. *See Federated Mut. Ins. Co. v. Anderson,* 297 Mont. 33, 991 P.2d 915, 922–23 (1999) (allowing some litigation conduct, specifically meritless appeals, to be introduced as evidence of bad faith). This is, no doubt, because *Palmer* expressly left the door open for the admission of evidence of extraordinary post-filing conduct to support a bad faith claim, with the restriction that it should "rarely be admitted." However, given the chilling effect that allowing introduction of evidence of litigation conduct would have on the exercise of an insurance company's legitimate litigation rights, any exception threatens to turn our adversarial system on its head. We are confident that the remedies provided by the Rules of Civil Procedure for any wrongdoing that may occur within the context of the litigation itself render unnecessary the introduction of evidence of litigation conduct. This is particularly true given that the attorneys, who in fact control and perpetuate the litigation conduct on behalf of an insurance company, are subject to direct sanction under the Civil Rules for any improper conduct. Though it goes without saying, we also note that those attorneys have significant duties under the Rules of Professional Responsibility, which allow for further sanctions for unethical behavior. Thus, we think the better approach is an absolute prohibition on the introduction of such evidence in actions brought under KRS 304.12–230.[4]

■ Our preferred rule as to what evidence of post-filing conduct may be admissible in a bad faith action is best summed up as follows:

---

4. We also note application of this approach means we need not address Zurich's claims under the Kentucky Constitution, specifically that allowing introduction of such litigation conduct evidence would violate Section 116, which grants to the Court of Justice the sole power to regulate the practice of law, and would mean that UCSPA applies to attorneys (in addition to insurance companies), thus violating Section 51, which prohibits the General Assembly from enacting laws that relate to more than one subject.

One should note a distinguishing factor between the insurer's settlement behavior during litigation and its other litigation conduct. The Rules of Civil Procedure provide remedies for the latter. To permit the jury to pass judgment on the defense counsel's trial tactics and to premise a finding of bad faith on counsel's conduct places an unfair burden on the insurer's counsel, potentially inhibiting the defense of the insurer. An insurer's settlement offers, on the other hand, are not a separate abuse of the litigation process itself. If a litigant refuses to settle or makes low offers, his adversary cannot avail himself of motions to compel, argument, or cross-examination to correct his failure.

In principle, an insurer's duty to settle should continue after the commencement of litigation. If the insurer were immunized for objectional settlement conduct occurring after litigation begins, the insured would be left without a remedy. It makes sense, therefore, to hold the insurer responsible for such conduct. The rules, however, provide litigants with protection against other forms of litigation [conduct], and for that reason a court could rationally exclude evidence of the insurer's other misdeeds committed during the litigation process.

Stephen S. Ashley, *Bad Faith Actions Liability and Damages* § 5A:6 (2005).[5]

■ We must add, however, that such evidence is not automatically admissible. Evidence of post-filing conduct may often be of limited relevance to a claim of bad faith and raises distinct concerns about prejudice to the insurance company. While resolution of the tension between the competing considerations of probativeness and prejudice is an unquestioned requirement of the law of evidence, *see* KRE 403, we note that there has been heightened concern about this issue, as it applies to post-filing conduct, since courts began considering such evidence of bad faith. *See White,* 221 Cal.Rptr. 509, 710 P.2d at 317 n. 9. Thus, while it will no doubt further limit the admissibility of post-filing behavior, we want to emphasize that before admitting evidence of post-filing behavior, courts must be careful to weigh the probativeness of the proposed evidence against its potential for prejudice, as required by KRE 403. *See Timberlake Const. Co. v. U.S. Fidelity and Guar. Co.,* 71 F.3d 335, 341 (10th Cir.1995) ("In light of existing case law and the public policy concerns ..., ... while evidence of an insurer's litigation conduct may, in some rare instances, be admissible on the issue of bad faith, such evidence will generally be inadmissible, as it lacks probative value and carries a high risk of prejudice. *See* Fed.R.Evid. 401, 403.").

For the foregoing reasons, the Court of Appeals is reversed.

LAMBERT, C.J.; GRAVES and JOHNSTONE, JJ., concur.

COOPER, J., dissents by separate opinion.

WINTERSHEIMER, J., dissents by separate opinion in which SCOTT, J., joins.

COOPER, Justice, dissenting.

I would concur in the majority opinion if this were a first-party bad faith action in which Mr. and Mrs. Knotts were Zurich's insureds. In that event, Zurich would owe a continuing fiduciary duty of good faith

---

5. We also note, since Knotts alludes in his brief to the possibility of introducing such evidence, that evidence of improper or abusive tactics by an insurance company during litigation of the bad faith action itself are truly irrelevant to proof of bad faith in handling the underlying claim. Such evidence simply is inadmissible in the bad faith suit.

and fair dealing implicit in the insurance contract purchased by the insureds that would not conflict with any superior duty that it might owe to someone else. *See Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 380 (Ky.2000) ("[A] bad faith action is based upon the fiduciary duty owed by an insurance company to its insured based upon the insurance contract."). A first-party bad faith action is one brought by the insured against the insurance company seeking to enforce coverage claimed to be provided by the insured's own policy, *e.g.*, homeowner's claims, uninsured (UM) and underinsured (UIM) motorist claims, claims for collision coverage payments, basic reparation benefit (BRB) claims, enforcement of duty to defend, enforcement of denied coverage, etc. This case, however, is a third-party bad faith action by tort plaintiffs, strangers to the insurance contract who claim that the tortfeasor's liability insurance carrier owed them a fiduciary duty of good faith and fair dealing in defending the tort action they brought against its insured.

In Kentucky, both first-party and third-party claims can be premised upon a violation of KRS 304.12–230, the Unfair Claims Settlement Practices Act ("UCSPA"). *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky.1988); *FB Ins. Co. v. Jones*, 864 S.W.2d 926, 929 (Ky.App. 1993). I agree that the insurer's duty to negotiate in good faith with its own insured continues even after the commencement by the insured of a first-party action against the insurer (*See White v. W. Title Ins. Co.*, 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 317 (1985)) ("[T]he contractual relationship between insurer and the insured does not terminate with commencement of litigation."). However, I do not agree that the insurer owes any duty to a third party after that party commences a tort action against the insured. *Cf. Palmer v. Ted Stevens Honda, Inc.*, 193 Cal.App.3d 530, 238 Cal.Rptr. 363, 368 (1987) ("[U]nlike *White*, there was no continuing contractual relationship between plaintiff and defendant in the instant case and therefore no implied covenant to treat plaintiff fairly. . . .").

When the tort plaintiff commences the tort action against the insured tortfeasor, the insurer's primary obligation is the defense of its insured. *J. Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279–80 (Ky. 1991); *Wolford v. Wolford*, 662 S.W.2d 835, 838 (Ky.1984). If the insurer violates that duty, *e.g.*, by failing to pay a reasonable settlement demand, *Harvin v. U.S. Fid. & Guar. Co.*, 428 S.W.2d 213, 214–15 (Ky.1968), and such results in an excess judgment against the insured, the insurer can be liable to the insured for the excess, and the insured can make an assignment of the chose in action to the injured plaintiff. *Manchester Ins. & Indem. Co. v. Grundy*, 531 S.W.2d 493, 498 (Ky.1975). However, it makes no sense to say that the insurer is answerable to the tort plaintiff for the manner in which it performs its contractual duty to defend its insured against the tort action. The potential for a conflict of interest in that scenario is self-evident. Once suit is filed, the Rules of Civil Procedure control the conduct of the parties and provide remedies for any alleged abuses. *Palmer*, 238 Cal.Rptr. at 369 ("Litigation is governed by a different set of rules. It is for the law-and-motion judge and not the jury to assess whether a party should be penalized for bad faith discovery positions."); *Roussalis v. Wyo. Med. Ctr., Inc.*, 4 P.3d 209, 257 (Wyo.2000) ("The Rules of Civil Procedure control the litigation process and, in most instances, provide adequate remedies for improper conduct during the litigation process. Once the parties have assumed adversarial roles, it is generally for the judge in the

underlying case and not a jury to determine whether a party should be penalized for bad faith tactics.").

Thus, while *Reeder* permits a plaintiff to sue the tortfeasor's insurer premised upon a violation of the UCSPA, a violation of the UCSPA cannot be premised upon actions occurring after the plaintiff sues the insured in tort. Thereafter, the insurer's duty is to its insured, and the insurer can determine for itself how settlement negotiations enter into the defense strategy. (In *Reeder*, the insurer's CR 12.02 motion to dismiss was granted, so the case did not address whether a UCSPA violation could be premised upon conduct occurring after suit was filed. 763 S.W.2d at 117. In *Motorists Mutual Insurance Co. v. Glass*, 996 S.W.2d 437 (Ky.1997), the actions giving rise to the bad faith claims all occurred prior to the commencement of the lawsuit except failure to pay a settlement demand in excess of policy limits, which, of course, could not constitute bad faith. *Id.* at 442–46.)

Each foreign case, save one, that has been cited in this action for the proposition that suit can be brought against an insurer for a violation of the UCSPA was a *first-party claim*. *See Timberlake Const. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 338 (10th Cir.1995) (denial of coverage to insured under builder's risk policy); *Graham v. Gallant Ins. Group*, 60 F.Supp.2d 632, 633 (W.D.Ky.1999) (UM and collision coverage claims); *Parker v. S. Farm Bureau Cas. Ins. Co.*, 326 Ark. 1073, 935 S.W.2d 556, 557 (1996) (action to enforce denied automobile liability and collision coverage); *White v. W. Title Ins. Co.*, 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309, 311 (1985) (action to enforce denied title insurance coverage); *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1766, 31 Cal.Rptr.2d 224, 225 (1994) (homeowner's claim); *Cal. Physicians' Serv. v.*

*Superior Court*, 9 Cal.App.4th 1321, 12 Cal.Rptr.2d 95, 95–96 (1992) (claim under health insurance policy); *Nies v. Nat'l Auto. & Cas. Ins. Co.*, 199 Cal.App.3d 1192, 245 Cal.Rptr. 518, 519 (1988) (UM claim); *Palmer ex rel. Diacon v. Farmers Ins. Exch.*, 261 Mont. 91, 861 P.2d 895, 899 (1993) (UM claim); *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 902–03 (Pa.Super.Ct.1999) (homeowner's claim). The only exception is *Barefield v. DPIC Cos., Inc.*, 215 W.Va. 544, 600 S.E.2d 256 (2004). However, all of the cases cited by *Barefield* in support of its holding were also first-party actions. *See Tucson Airport Auth. v. Certain Underwriters*, 186 Ariz. 45, 918 P.2d 1063, 1064 (App.1996) (failure to defend); *Gooch v. State Farm Mut. Auto. Ins. Co.*, 712 N.E.2d 38, 39 (Ind.Ct.App.1999) (UM claim); *Federated Mut. Ins. Co. v. Anderson*, 297 Mont. 33, 991 P.2d 915, 919 (1999) (denial of coverage); *Palmer*, 861 P.2d at 899 (UM claim); *O'Donnell*, 734 A.2d at 902–03 (homeowners' claim). To date, no other jurisdiction has cited *Barefield* for the proposition that a third party tort claimant can bring a bad faith action against the tortfeasor's insurer.

An overwhelming majority of jurisdictions that have addressed the issue do not allow any third-party bad faith actions whatsoever against insurers. *E.g., O.K. Lumber Co., Inc., v. Providence Washington Ins. Co.*, 759 P.2d 523, 525–26 (Alaska 1988) ("The relationship between the claimant and an insurance carrier for a third party alleged to be liable is an adversary relationship giving rise to no fiduciary obligation on the part of such insurance carrier to the claimant. Any obligation to deal with settlement offers in good faith runs only to the insured."); *Page v. Allstate Ins. Co.*, 126 Ariz. 258, 614 P.2d 339, 340 (App.1980) ("The duty to settle is intended to benefit the insured, not the injured claimant."); *Murphy v. Allstate Ins.*

*Co.*, 17 Cal.3d 937, 132 Cal.Rptr. 424, 553 P.2d 584, 586–87 (1976) (insured's duty to settle runs to the insured, not to the injured claimant);[1] *Scroggins v. Allstate Ins. Co.*, 74 Ill.App.3d 1027, 30 Ill.Dec. 682, 393 N.E.2d 718, 721–22 (1979) (insurer's duty of good faith and fair dealing is owed to insured, not to third parties); *Menefee v. Schurr*, 751 N.E.2d 757, 761 (Ind.Ct. App.2001) ("The excess liability of [a liability insurance] company arises out of the relationship between insured and company. Claimant is a stranger to that relationship.").

See also *Bates v. Allied Mut. Ins. Co.*, 467 N.W.2d 255, 258 (Iowa 1991) ("[W]hile an insurer has a fiduciary relationship with its insured, it has an adversarial relationship with a third-party claimant. Therefore, a tort victim, as a third-party claimant, cannot compel a tortfeasor's insurer to negotiate and settle a claim in good faith anymore than he could compel the tortfeasor to do so himself." (Citation omitted.)); *Linscott v. State Farm Mut. Auto. Ins. Co.*, 368 A.2d 1161, 1163 (Me.1977) ("The pretrial negotiations which may be conducted between a tort claimant and a defending insurance company are adversary in nature and, hence, will not give rise to a duty to bargain in good faith, as claimed by plaintiff. A 'duty of good faith and fair dealing' in the handling of claims runs only to an insurance company's insured ...."); *Chavez v. Chenoweth*, 89 N.M. 423, 553 P.2d 703, 709 (App.1976) ("The 'bad faith dealing' rule applies between an insurer and insured. Plaintiff's dealings with State Farm in connection with damages based on [tortfeasor]'s alleged fault were not dealings between insurer and insured, but arm's length dealings on the basis of

plaintiff's claim against State Farm as the insurer of [tortfeasor]." (Citation omitted.)).

See also *Niemeyer v. U.S. Fid. & Guar. Co.*, 789 P.2d 1318, 1322 (Okla.1990) ("Because Niemeyer is a third party claimant, she could not bring a bad faith action against USF & G."); *Auclair v. Nationwide Mut. Ins. Co.*, 505 A.2d 431, 431 (R.I.1986) ("The relationship between the claimant and the insurance carrier for a third party alleged to be liable is an adversary relationship giving rise to no fiduciary obligation on the part of such insurance carrier to the claimant. Any obligation to deal with settlement offers in good faith runs only to the insured ...."); *Caserotti v. State Farm Ins. Co.*, 791 S.W.2d 561, 566 (Tex.App.1990) ("The present cause is distinguishable from those cases where courts have imposed a duty of good faith and fair dealing upon insurance companies. The cases imposing such a duty all involve first-party claims, *i.e.*, suits by *insureds* pursuant to their *own* insurance policies after their insurer wrongly denied or delayed recovery of the insureds' claims."); *Pixton v. State Farm Mut. Auto. Ins. Co.*, 809 P.2d 746, 749 (Utah Ct.App.1991) ("[T]here is no duty of good faith and fair dealing imposed upon an insurer running to a third-party claimant, such as Pixton, seeking to recover against the company's insured."); *Kranzush v. Badger State Mut. Cas. Co.*, 103 Wis.2d 56, 307 N.W.2d 256, 265 (1981) ("The insurer's duty of good faith and fair dealing arises from the insurance contract and runs to the insured. No such duty can be implied in favor of the claimant from the contract since the claimant is a stranger to the contract and to the

1. The California Supreme Court subsequently held in *Royal Globe Insurance Co. v. Superior Court*, 23 Cal.3d 880, 153 Cal.Rptr. 842, 592 P.2d 329, 334 (1979), that both first-party and third-party bad faith actions against insurers

were authorized. *Royal Globe* was overruled on both points by *Moradi–Shalal v. Fireman's Fund Insurance Cos.*, 46 Cal.3d 287, 250 Cal. Rptr. 116, 758 P.2d 58, 63, 66 (1988).

fiduciary relationship it signifies."); *Herrig v. Herrig,* 844 P.2d 487, 491 (Wyo.1992) ("[C]ourts simply refuse to place an insurer in the untenable position of owing a duty of good faith and fair dealing to both the insured and the adversary of the insured, whether in the double-insured context or not.").

In *Menefee v. Schurr,* the Indiana Court of Appeals noted that "[o]nly four states, Kentucky [*see Reeder* ], Louisiana, Massachusetts, and West Virginia [*see Barefield* ] ... permit third-party direct action bad faith claims ... against insurers." *Menefee,* 751 N.E.2d at 761 n. 2. Massachusetts created its right of direct action by a 1979 amendment of its Uniform Trade Protection Acts, Mass. Gen. Laws ch. 93A, § 9(1), under which UCSPA-type claims are litigated, to provide that "[a]ny person, other than a person entitled to bring action under section eleven of this chapter, who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two ... or any person whose rights are affected by another person violating the provisions of [G.L. c. 176D, § 3(9) ] may bring an action ...." 1979 Mass. Acts ch. 406, § 1. Although Louisiana does permit a third-party direct action against an insurer for a violation of its Uniform Trade Practices Act, La.Rev.Stat. Ann. § 22:1220(A), which specifically contains language requiring a "reasonable effort to settle claims with insured *or the claimant,*" (emphasis added), it does not permit a third-party direct action against an insurer for a violation of the UCSPA, La.Rev.Stat. Ann. § 22:1214, which contains no such language. *Theriot v. Midland Risk Ins. Co.,* 694 So.2d 184, 190–91 (La.1997).

Thus, Kentucky, Massachusetts, and West Virginia stand alone in permitting a third-party tort plaintiff to sue the tortfeasor's insurer for a UCSPA violation that occurs even prior to commencement of the tort action. Absent legislative authorization, I am unwilling to conclude that liability insurers owe a fiduciary responsibility both to its insured *and* to the tort plaintiff who sued its insured, thus triggering the insurer's contractual duty to defend.

Accordingly, I dissent.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the majority opinion because an insurance company must continue to abide by the Unfair Claims Settlement Practices Act, KRS 304.12–230 even after a lawsuit has been filed against its insured.

We recognize that the majority opinion does reverse the Court of Appeals. However, the majority does not go far enough in reversing and as such the result is of very limited value, if any, to these appellants or any others who may share the same general problem. Any conduct engaged in by the insurer may form the basis of a bad faith claim.

This is a case of first impression in Kentucky. The major issue is whether the Act regulates only the pre-litigation claims adjusting process. Stated differently, whether an insurance company can be guilty of bad faith conduct after a lawsuit has been filed against its insured. Other related questions are whether Kentucky or federal case law supports a continuing duty of good faith after the filing of a lawsuit; whether other jurisdictions recognize such a duty; whether the construction by the Court of Appeals of the word "claim" is contrary to its common usage; and, whether a rule relating to post-litigation conduct violates the separation of powers.

Lloyd Knotts, a self-employed construction contractor, suffered serious and permanent injuries as a result of a fall from a 30–foot high platform while working on the premises of Lawson–Mardon, Inc. At the time of the accident, Lawson–Mardon was insured under a policy of general liability insurance issued by the Zurich Insurance Company. Knotts incurred significant medical and hospital expenses because of his severe injuries for which he did not have available health insurance. Zurich refused to assist Knotts with payment of any of his medical expenses and thereby prevented him from obtaining necessary medical care. As a result of the denial of assistance, Knotts proceeded with the filing of a lawsuit against the insured, Lawson–Mardon, Inc., approximately two months after the accident. The jury awarded damages totaling $1,202,104.29, which was reduced by 20% for comparative fault, resulting in a judgment of $961,683.44 for Lloyd Knotts and $20,000.00 for his wife, Jackie Knotts, for her loss of consortium. The judgment was appealed to the Court of Appeals which affirmed the jury verdict.

The Knottses then began the present litigation, alleging continued bad faith conduct by Zurich after the filing of the lawsuit. The circuit judge granted summary judgment in favor of Zurich, holding that the statute upon which the claim was based did not apply to behavior that occurred after litigation commenced. The Court of Appeals affirmed and this Court accepted discretionary review.

## I. UCSPA

The Kentucky Unfair Claims Settlement Practices Act, KRS 304.12–230, is almost a verbatim adoption of the 1971 version of the model act formulated by the National Association of Insurance Commissioners entitled "An Act Relating to Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance." *Davidson v. American Freightways, Inc.*, 25 S.W.3d 94, 96 (Ky. 2000). This model act has been adopted in one form or another in all 50 states and all territories. *Id.* at 96–97. The UCSPA is intended to protect the public from unfair trade practices and fraud, and it should be liberally construed so as to effectuate its purpose. *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky.1988).

The statute is remedial legislation and should be broadly interpreted so as to accomplish its intended purpose, that is, to make certain that insurance companies deal fairly with their insureds and third party claimants throughout the claim handling process. There is nothing that is contained in the statute which terminates the responsibility of an insurance company to act in good faith, even though a lawsuit has been filed against its insured. The company still has an obligation to exercise good faith in an attempt to complete a prompt, fair and equitable settlement of the claim in which liability against its insured has become reasonably clear. KRS 304.12–230(6).

It should be abundantly clear that this continuing responsibility of good faith throughout the pendency of the claim is separate and distinct from the obligations imposed on the insured and their counsel under the civil rules of procedure once litigation begins. It should also be observed that the UCSPA is not intended to interfere with the exercise of an attorney's zealous, independent, professional judgment in the defense of a client. An attorney retained by an insurance company to defend an insured is ethically required to independently and vigorously defend the interest of the insured.

Counsel employed by the insurance company to defend its insureds cannot compel

the company to act in good faith once a lawsuit has been filed against the insured. They are paid for their services by the insurance company, and their involvement in the litigation is dependent on the selection process of the insurance company. Counsel for the insurance company has no authority to control the conduct of the company, which is not a party to the litigation. In this case, Zurich had distributed a litigation manual outlining how counsel had to defend its insureds.

There has long been a policy in Kentucky that insurance companies should work diligently to fairly settle claims so as to avoid filing of a lawsuit. However, if the company is not subject to the Unfair Claims Settlement Practices Act, a company could have an incentive to make litigation, rather than settlement, realizing that nothing they did after the date of filing could constitute bad faith. This would violate the fiduciary relationship that exists between an insurer and its insured. *Cf. Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176 (Ky.1989).

The alleged bad faith by Zurich in violation of the Act does not involve litigation conduct of the parties or their counsel. The Knottses are not basing their bad faith claims against Zurich on the litigation tactics or strategies used by the insured, Lawson–Mardon, or its attorneys in the matter in which they defended that company. Instead, it is based solely on the manner in which Zurich failed to process, evaluate and extend a fair and reasonable settlement offer based on information available to it regarding both liability and damage issues throughout the entire course of its handling of the claim against its insured.

An insurance company can be guilty of bad faith conduct in the manner in which it continues to handle a claim against its insured even after a lawsuit has been filed against the insured. The rules of civil procedure do not have any applicability to the conduct of an insurance company in its handling of the claim and the insurance company is not a party to the litigation. The Act and industry standards govern the manner in which insurance companies handle claims against its insured, both prior to and subsequent to the litigation. The practical effect of this decision would be to allow an insurance company to insulate itself from any bad faith conduct merely because a lawsuit has been filed.

## II.  Kentucky Case Law

Although this is an issue of first impression in Kentucky, decisions rendered by federal courts in both the Eastern and Western Districts applying Kentucky law support the contention that the insurance company has a duty of good faith which continues past the filing of a bad faith complaint against the insurer. *Cf. Graham v. Gallant Ins. Group*, 60 F.Supp.2d 632 (W.D.Ky.1999) and *Cobb King v. Liberty Mut. Ins. Co.*, 54 Fed.Appx. 833 (6th Cir.2003). It should also be noted that *Motorists Mutual Insurance Co. v. Glass*, 996 S.W.2d 437 (Ky.1997), held that the same principles apply to third-party claims as to first party claims. Kentucky has refused to make any type of distinction regarding the nature of proof that must be presented to establish a third-party bad faith claim as opposed to a first party claim. Any reliance on the case of *Torres v. American Employers Ins. Co.*, 151 Fed. Appx. 402 (6th Cir.2005), is unpersuasive. A reading of the *Torres* opinion indicates that the court was relying on the Court of Appeals in this case, even though that opinion was not a final decision.

## III.  Other Jurisdictions

There is general acceptance by many other jurisdictions that the duty of an in-

surer to use good faith is a continuing responsibility that does not end simply because litigation has begun. *White v. Western Title Ins. Co.,* 40 Cal.3d 870, 221 Cal.Rptr. 509, 710 P.2d 309 (1985), is considered as the seminal case establishing that insurance companies have a continuing duty to a policyholder throughout litigation. In *White, supra,* the California Supreme Court authorized the admission of evidence of unreasonably low settlement offers made during trial to establish that the insurance company had acted in bad faith.

The Supreme Court of West Virginia has considered the question in *Barefield v. DPIC Companies, Inc.,* 215 W.Va. 544, 600 S.E.2d 256 (2004) and held that "the conduct of an insurance company or other person in the business of insurance during the pendency of a lawsuit may support a cause of action under West Virginia Trade Practices Act." Both the West Virginia Act and the Kentucky Act are based on model legislation promulgated by the National Association of Insurance Commissioners.

## IV. "Claim"

The word "claim" is not specifically defined anywhere within the Act. Consequently, the word must be construed according to its common usage. KRS 446.080(4); *Alliant Health System v. Ky. Unemployment Ins. Comm'n,* 912 S.W.2d 452 (Ky.App.1995). The word "claim" has many meanings, including "a demand for something as due; an assertion of a right to something." *II Oxford English Dictionary* 451 (1970); "a demand for something due or believed to be due." *Merriam–Webster's Collegiate Dictionary* 210 (10th Ed., 2001); and, "a demand for compensation, benefits, or payment (as ... one made under an insurance policy upon the happening of the contingency against which it is issued)." *Webster's Third New International Dictionary* 414 (1970). The common usage of "claim" also includes "cause of action." *Kyriss v. Aetna Life & Casualty Co.,* 624 F.Supp. 1130 (D.Mont. 1986).

The legislature's repeated use of the word "claim" in the Act indicates an intent to impose duties upon those in the business of insurance to deal fairly with persons asserting a right or demanding something that is believed to be rightfully due under an insurance policy. *Barefield, supra.* A lawsuit or litigation is simply a means of asserting a right or demanding something by using the judicial process. *Barefield.*

"Settlement" is commonly understood to mean the ending of a dispute by a final decision or agreement. *See Webster's II New Riverside University Dictionary* 1068 (1988). The plain literal meaning of settlement in no way inhibits the Act from extending the duty of an insurer to act in good faith and with fair dealing beyond the commencement of litigation. It is obvious that a settlement can occur at any time before or after litigation which would include the finality on appeal.

There is no language in the Act that limits the applicability to pre-complaint behavior. If the legislature had intended that the statute should not apply to the conduct of an insurance company after suit had been filed, it could have easily provided definite language to that effect. It did not. The courts are not entitled to add language to existing statutes. The statute clearly does not apply just to claims adjusting. After all, the statute prohibits "unfair claims settlement practices" not "unfair claims adjustment practices."

## VI. Constitutional Concerns

The Court of Appeals concluded that the Separation of Powers Doctrine announced in Sections 27 and 28 of the Kentucky

Constitution would prohibit legislation from regulating post-litigation conduct because Section 116 of the Constitution grants this Court sole authority to regulate the conduct of attorneys. This holding demonstrates a fundamental misconception of the majority rule, as well as the statute involved. The majority of courts that have examined this issue have unanimously recognized that juries cannot pass judgment on the conduct of attorneys and thus cannot be permitted to censure an insurer for engaging in zealous advocacy. The allegations in this matter do not focus on the conduct undertaken by the defendant insurer on the advice of counsel; rather they indicate that claims handlers disregarded the advice of counsel to the benefit of the insurer and in contravention of the Act. It is the behavior of the agents and employees of the insurance company that is the subject of the Act, not the conduct of attorneys who are engaged in the litigation. The adoption of a rule relating to the post-litigation behavior of an insurance company does not violate the provisions on separation of powers in the Kentucky Constitution.

The clear and unambiguous language of KRS 304.12–230, its remedial nature and the legislative intent underlying the statute, all indicate that it is the duty of an insurer to exercise good faith and fair dealing and that the duty continues and does not end simply because litigation has begun. The Act was intended to protect the public from unfair trade practices and fraud and because of the nature of settlement negotiations the duty of good faith exists pre-litigation, during trial and post-litigation until the matter is finally resolved.

The decision of the Court of Appeals should be reversed and this case remanded to the circuit court with directions to vacate the summary judgment.

SCOTT, J. joins.