**Mary V. O'DONNELL, By and Through Her Attorney–In–Fact Joan T. MITRO, Appellant,**

v.

**ALLSTATE INSURANCE COMPANY, Appellee.**

Superior Court of Pennsylvania.

Argued April 28, 1999.

Filed June 30, 1999.

902

Robert J. Reger, Wayne, for appellants.

Bonnie S. Stein, Morrisville, for appellee.

Before DEL SOLE, MONTEMURO* and BECK, JJ.

MONTEMURO, J:

¶ 1 Appellant, Mary O'Donnell, through her attorney-in-fact Joan Mitro, appeals from the judgment entered in the Chester County Court of Common Pleas following an unsuccessful jury trial in an action for bad faith against her insurer, Allstate Insurance Company (Allstate). For the reasons set forth below, we affirm.

¶ 2 This matter arises from a claim submitted by Mary O'Donnell, through her daughter and attorney-in-fact, Joan Mitro, for benefits under a homeowner's insur-

* Retired Justice assigned to Superior Court.

ance policy. On July 17, 1994, the home of Mary O'Donnell was allegedly burglarized. The burglary was discovered by Mitro's husband, Jay McAtee, who notified the police. At the time of the alleged break-in, no one was living in the house and it was listed for sale; it was later learned that no one had been living there for six months due to Ms. O'Donnell's admission to a nursing home. Officer Chappelle testified that when he arrived at the scene, he saw no signs of forced entry, and the interior of the home appeared neat and orderly. Moreover, the Officer noted the lack of valuables, and subsequently discovered through investigation that Ms. O'Donnell's family had previously removed many items from the home in preparation for its sale.[1]

¶ 3 At the time of this incident, the O'Donnell residence was covered by a homeowner's policy issued by Allstate. Ms. Mitro first contacted Allstate on August 1, 1994, two weeks after the loss, at which time Senior Claim Representative Adrienne Gallo was assigned to the matter. Ms. Mitro informed Ms. Gallo that she would be handling the claim pursuant to a power of attorney since her mother was hospitalized. In a letter addressed to Ms. Mitro, Allstate requested a complete list of stolen items, including the dates and places of purchase as well any original receipts or other indicia of ownership.

¶ 4 At the end of September, Ms. Mitro forwarded a packet of information containing a list of the stolen items, copies of receipts, and miscellaneous photographs and instruction manuals. The list of missing items included: twelve rare silver and gold coins; 12 five piece sterling silver Oneida place settings and eight serving pieces; 1.3 carat diamond ring and matching wedding band; double and single strand cultured pearl necklaces; sterling silver and diamond bracelet; antique gold watch; pearl pin and earring set; Peugeot gold-plated watch; Lladro nativity set; silver candlesticks; Lenox dish and vase; GE VCR and camera; Canon 35mm camera; Panasonic clock radio/recorder; Sony portable tv/radio; and a Fendi leather handbag. Ms. Mitro estimated the value of the stolen property at over $12,000.00.

¶ 5 Upon receipt of Ms. Mitro's information, Allstate began to conduct an investigation. In an attempt to verify the claimed losses, Allstate uncovered numerous inconsistencies in the information provided by Ms. Mitro. For example, many receipts submitted as proof of purchase for various stolen items were actually in Ms. Mitro's name, thus suggesting Mitro's rather than O'Donnell's ownership of the items. Therefore, over the next few months, Allstate requested certain additional information from Ms. Mitro including: the original receipts for the missing items; a copy of the power of attorney; a sworn proof of loss;[2] a copy of Ms. O'Donnell's husband's death certificate; a copy of the Agreement of Sale for the property; an Examination under Oath[3] of both Ms. O'Donnell and Ms. Mitro; and the addresses and telephone numbers of Ms. Mitro's uncle and brother who provided affidavits to support the existence and value of the stolen coins and nativity set, aggregately estimated at over $2000.00. During this time, Allstate also contacted Ms. O'Donnell, who resided at a long-term care facility, to verify certain matters.

---

1. An agreement of sale for the property was signed one month later, on August 18, 1994. (N.T. 2/10/98 at 68).

2. Although not specifically defined, it appears that a sworn proof of loss statement is a notarized document consisting of a statement from the insured relating to the circumstances of the loss and an enumeration of the claimed items.

3. As gleaned from the record, an Examination under Oath, customary in the insurance industry, is akin to a deposition only to the extent that the insured is questioned by the insurer, under threat of perjury, regarding the circumstances of the loss and the items for which recovery is sought. However, a deposition involves a broader scope of subject matter.

¶ 6 Ms. Mitro soon became frustrated with Allstate's investigative practices after receiving additional requests for information which she considered irrelevant and duplicative, as well as discovering that Allstate had contacted her dementia-stricken mother without permission; therefore, she failed to provide Allstate with a sworn proof of loss statement,[4] and refused to submit to an Examination under Oath or furnish the Agreement of Sale and the addresses of her brother and uncle. Instead, on May 4, 1995, Ms. Mitro filed a complaint against Allstate alleging breach of contract, bad faith and violations of the Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201–2, claiming that despite her efforts to comply with Allstate's requests, the insurer had unreasonably refused to evaluate her claim and issue either a denial or payment for the stolen items.

¶ 7 The matter proceeded to a jury trial during which both parties presented evidence and expert testimony. Allstate claimed that it did not act in bad faith, reasoning that certain "red-flags" were present in this case which required a more thorough investigation to verify the claimed loss. After deliberations, the jury returned a verdict in favor of Allstate. Upon the denial of her post-trial motions, Ms. Mitro filed the instant appeal claiming that a new trial is warranted based on four allegations of trial court error.[5]

¶ 8 In this appeal, Appellant raises an issue of first impression by seeking to ascertain the proper scope of 42 Pa.C.S.A. § 8371. Specifically, we are asked to determine whether in an action for bad faith against an insurer, the jury is restricted to considering only evidence of bad faith which occurred prior to the filing of the lawsuit, or, whether it may also consider evidence of an insurer's bad faith conduct occurring during the pendency of litigation. Upon review, we conclude that a narrow construction of section 8371, as suggested by the former, is contrary to the purpose of the statute to deter bad faith conduct of insurers.

¶ 9 Appellant's claim is presented in the context of a challenge to jury instructions. The purpose of a jury charge is to clarify the legal principles at issue. *General Equipment Mfr. v. Westfield Ins. Co.*, 430 Pa.Super. 526, 635 A.2d 173, 184 (1993), *appeal denied*, 537 Pa. 663, 644 A.2d 1200 (1994). Thus, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations. *Von der Heide v. Commonwealth of Pa.*, 553 Pa. 120, 126–27, 718 A.2d 286, 290 (1998). Conversely, a new trial is warranted if a jury instruction is fundamentally erroneous and may have been responsible for the verdict. *Chanthavong v. Tran*, 452 Pa.Super. 378, 682 A.2d 334, 340 (1996).

¶ 10 At trial, Appellant challenged the court's jury instruction regarding the proper scope of Allstate's alleged bad faith conduct. After defining bad faith and the plaintiff's burden of proof, the court stated:

It's been argued to you that subsequent to the institution of suit, statements were taken under oath, and whether the

---

4. Ms. Mitro submitted a copy of the loss statement rather than a notarized original.

5. Appellant raises the following issues:
   A. Did the Trial Court err in permitting the introduction of evidence supporting Allstate's post-litigation bad faith conduct and argument thereon only to subsequently instruct the jury, in the middle of their deliberations, that such evidence was not to be considered?
   B. Did the Trial Court err in granting Appellee, Allstate's, compulsory non-suit to Appellant's Unfair Trade Practices and Consumer Protection Law claim?
   C. Did the Trial Court improperly interject its personal beliefs into the case thereby reflecting its personal bias in favor of the Appellee to the great prejudice and detriment of the Appellant?
   D. Did the Trial Court err in allowing Thomas J. Duffy, Esquire to testify on behalf of the Appellee as an expert witness?

(Appellant's Brief at 3).

insurance company should have had to pay based on that. Obviously what we are talking about here [regarding bad faith] is what occurred prior to the institution of the lawsuit, the conduct of the insurance company prior to the point where we get ourselves involved in a lawsuit.

(N.T. 2/11/98, vol. III at 285). After retiring to deliberate, the jury issued a question:

In judging the issue of bad faith, are we judging the handling of the case by Allstate until the lawsuit was filed or through today?

(N.T. 2/11/98, vol. IV at 4). The court responded: "Until the lawsuit was filed." (*Id.*).

¶ 11 While acknowledging that there is no state court authority on this point, Appellant argues that restricting the jury's consideration to evidence of Allstate's pre-lawsuit conduct is against the spirit of the bad faith statute, 42 Pa.C.S.A. § 8371. Appellant contends that Allstate's submission of interrogatories seeking "frivolous" and irrelevant information, as well as its refusal either to accept or deny Appellant's claim following her deposition, constitute clear acts of bad faith which the jury should have been permitted to consider in its evaluation of Allstate's conduct. *See* Appellant's Brief at 20.

¶ 12 It is well settled that an insurer is obligated to act in good faith and fair dealing with its insured. *See Kilmore v. Erie Ins. Co.*, 407 Pa.Super. 245, 595 A.2d 623, 626 (1991), *appeal denied*, 529 Pa. 664, 604 A.2d 1030 (1992). However, in *D'Ambrosio v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 494 Pa. 501, 431 A.2d 966 (1981), our Supreme Court noted that "[a]lthough the seriousness of 'bad faith' conduct by insurance carriers cannot go unrecognized," *id.* at 505, 431 A.2d at 969, a judicially created cause of action is unnecessary since the provisions of the Uniform Insurance Practices Act (UIPA), enforced by the state Insurance Commissioner, are

sufficient to deter bad faith conduct. *Id.* at 507, 431 A.2d at 970.

¶ 13 In 1990, our legislature responded to the Court's refusal to create a common law remedy by enacting section 8371. This statute provides that

[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371(1)–(3).

¶ 14 Although it is not defined by the statute, our Court has adopted the following definition of "bad faith" as applicable in the context of insurance:

"Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228, 1232 (1994)(quoting Black's Law Dictionary 139 (6th ed.1990)); *Terletsky v. Prudential Property & Casualty Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994), *appeal denied*, 540 Pa. 641, 659 A.2d 560 (1995). It has been noted that the purpose of section 8371 is "to provide a statutory remedy to an insured when the insurer denied benefits in bad faith." *General Accident Ins. Co. v. Federal Kemper Ins. Co.*,

452 Pa.Super. 581, 682 A.2d 819, 822 (1996).

¶ 15 Generally, success in bringing a claim of bad faith requires the insured to present clear and convincing evidence that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *MGA Ins. Co. v. Bakos*, 699 A.2d 751, 754 (Pa.Super.1997). It is now clear, however, that section 8371 is not restricted to an insurer's bad faith in denying a claim. An action for bad faith may also extend to the insurer's investigative practices.

¶ 16 In *Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228 (1994), our Court held that when evaluating the conduct of an insurer under section 8731, the trial court "may look to (1) other cases construing the statute and the law of "bad faith" generally; (2) the plain meaning of the term(s) used in the statute; and/or (3) other statutes upon the same or similar subjects...." *Id.* at 1233. Specifically, our Court noted that conduct which constitutes a violation of the UIPA may also be considered when determining whether an insurer acted in bad faith under the statute. *Id. See* 40 P.S. § 1171.5 (UIPA—Unfair methods of competition and unfair or deceptive acts or practices defined). For example, under the UIPA, unfair claim settlement or compromise practices includes "[d]elaying investigation or payment of claims by requiring the insured ... to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information." 40 P.S. § 1171.5(10)(xii).

¶ 17 The few cases from this Commonwealth which address the applicability of section 8371 have arisen either from conduct of the insurer prior to litigation or its conduct following the entry of an arbitration or appraisal award. *See, e.g., MGA Ins. Co.*, 699 A.2d at 754 (challenging trial court's award of attorney's fees pursuant to finding that insurer acted in bad faith in petitioning to vacate/modify an arbitration award); *Terletsky*, 649 A.2d at 688 (alleging that insurer's low settlement offers prior to the uninsured motorists arbitration were indicative of bad faith); *Romano*, 646 A.2d at 1230 (demanding counsel fees for bad faith where insurer refused to pay full amount of umpire's award stemming from an appraisal provision of insurance contract, thereby forcing insured to hire counsel to file suit to enforce award). However, Appellant argues that "[g]iven the expanding applicability of the bad faith statute it is now clear ... that bad faith suits are not restricted to the denial of claims," but, rather, may extend to the misconduct of an insurer during the pendency of litigation. (Appellant's Brief at 15). We agree.

¶ 18 Our rules of statutory construction dictate that generally "provisions of a statute shall be liberally construed to effect their objects and to promote justice." 1 Pa.C.S.A. § 1928(c). The plain language of the section 8371 clearly reveals the lack of any restrictive language limiting the scope of bad faith conduct to that which occurred prior to the filing of a lawsuit. By enacting this statute, the legislature specifically responded to our Supreme Court's refusal to create a common law remedy, *see D'Ambrosio, supra,* and implicitly rejected the Court's conclusion that the provisions of the UIPA are sufficient to define and deter bad faith conduct by insurers. Therefore, we find that the broad language of section 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation. In so finding, we refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the insured.

¶ 19 Over six years ago, in *Rottmund v. Continental Assurance Co.*, 813 F.Supp. 1104 (E.D.Pa.1992), the federal district court attempted to predict the course of

Pennsylvania law on this very issue. There, the insured brought an action against Continental to recover the proceeds of her deceased husband's life insurance policy, raising, *inter alia*, a claim for bad faith pursuant to section 8371 for conduct of the insurer during the pendency of litigation.[6] Continental filed a motion *in limine* claiming the evidence of bad faith was precluded since "there is no evidence that the drafters of section 8371 intended the tort of bad faith to apply to the conduct of an insurer in the litigation arena." *Id.* at 1109. The court denied the motion *in limine,* reasoning that there was nothing in Pennsylvania caselaw or section 8371 itself which either suggested or held that the statute is limited to pre-litigation conduct. Rather, the court concluded that such a narrow construction of section 8371 "runs counter to [the] rule of liberal statutory construction and would defeat, rather than effectuate, the purpose of the statute, and would hinder, rather than promote, justice." *Id.* at 1110.

■ ¶ 20 We find the reasoning of *Rottmund* persuasive and, for the reasons set forth above, we now hold that the conduct of an insurer during the pendency of litigation may be considered as evidence of bad faith under section 8371.

¶ 21 Despite our holding, we nevertheless find that in the instant matter, the jury instruction restricting the jury's attention to Allstate's conduct prior to initiation of suit was proper. As a matter of law, the evidence presented by Appellant of Allstate's conduct during the course of litigation does not constitute bad faith and, therefore, such evidence was properly excluded from the jury's consideration.

¶ 22 At trial, Appellant claimed that Allstate's bad faith conduct in investigating her claim involved "dilatory tactics, requesting unnecessary and frivolous information and requesting information which had previously been submitted." (Appellant's Brief at 18–19). Appellant raises two instances occurring during the process of discovery which, she argues, should have been considered by the jury. Specifically, without much more elaboration, Appellant claims that Allstate acted in bad faith by propounding interrogatories requesting information "regarding repairs and renovations to [the] property, its foundation and the plumbing contained therein." (Appellant's Brief at 20). These inquiries, according to Appellant, are "frivolous" and fail to further Allstate's investigation of her claim. She also characterizes as bad faith Allstate's failure either to accept or deny her claim after she "submitted to a lengthy deposition." (Appellant's Brief at 20).

■ ¶ 23 Appellant baldly asserts that because "Allstate had everything it needed in its possession to either accept or deny the claim, yet never did . . . [t]his conduct is in bad faith." (*Id.*). This argument seems to suggest that because Allstate failed to accept or deny her claim after conducting a lengthy investigation prior to the commencement of Appellant's suit, any action on the part of Allstate in requesting additional information during the pendency of trial is in bad faith. We disagree.

¶ 24 Preliminarily, we note the existence of many "red flags," as identified and explained by Allstate's expert, that arose before the filing of the instant matter and prompted a more thorough and protracted investigation by the insurance provider.[7]

---

6. The insured claimed that Continental intentionally misdesignated a corporate deponent and purposefully concealed evidence relevant to her claim. *Rottmund,* 813 F.Supp. at 1109.

7. The trial court enumerated the "red flags" as follows:

1. [Appellant/Ms. Mitro] Ms. Mitro's failure to promptly report the loss to Allstate.
2. Ms. Mitro's initial failure to identify the correct date of the loss.
3. Ms. Mitro's failure to provide accurate information about the whereabouts of her mother, the insured.

For example, Ms. Mitro claimed that she and her brother divided the purchase of the stolen Llardo nativity set as a gift to her mother. However, it was later discovered by Allstate that the receipt submitted as validation for this purchase was from a women's apparel store. Moreover, Mitro refused to provide the address and telephone number of her brother so that Allstate could verify his affidavit and confirm the purchase of the nativity set. Ms. Mitro also listed as stolen an antique watch and a leather Fendi handbag; however, the receipts submitted for these items indicated that both were returned to Macy's for a credit before the date of the alleged burglary. After receiving the evidence, the jury returned a verdict in favor of Allstate.

■ ¶ 25 Appellant argues that if permitted to consider Allstate's conduct during litigation, the jury would have reached a different result. In its Opinion, the trial court states that its restriction of the jury charge to Allstate's pre-litigation conduct was neither fundamentally erroneous nor responsible for the verdict since "propounding discovery on the insured in preparation for trial and failing to settle a claim after a discovery deposition is conducted do not constitute acts of bad faith" under section 8371. (Trial Ct. Op. at 6). We agree. Despite the broad language of section 8371, we find that the statute clearly does not contemplate actions for bad faith based upon allegation of discovery violations.

■ ¶ 26 In disposing of this issue, we find particularly illuminating the reasoning of the United States Federal District Court for the Eastern District of Pennsylvania in *Slater v. Liberty Mut. Ins. Co.*, 1999 U.S. Dist. LEXIS 3753, 1999 WL 178367 (E.D. Pa., filed March 30, 1999). In this most recent decision, the federal district court predicted that the Pennsylvania courts would not permit recovery under section 8371 "for discovery abuses by an insurer or its lawyer in defending a claim predicated on its alleged prior bad faith handling of an insurance claim." *Id.* at \*6, 1999 WL 178367 at \*2. There, a plaintiff sought to amend its complaint against an insurer to include an action for bad faith pursuant to section 8371 based on alleged discovery violations committed during the pendency of litigation.[8] In denying the plaintiff's motion, the court not-

---

4. Ms. Mitro's statement that she didn't want the insured to know about the loss.

5. Ms. Mitro led Allstate to believe that she told her mother about the loss, but a subsequent discussion with Ms. Mitro revealed that she did not inform her mother about the loss.

6. Ms. Mitro informed [Allstate representative, ] Ms. Gallo that she did not want her mother to find out about the burglary, yet it was later discovered that the chest of drawers from which the alleged burglar removed the bottom drawer was taken to the insured's residence after the loss.

7. Ms. Mitro informed Ms. Gallo that every valuable item that was left in the insured's home was kept in the bottom drawer that was allegedly taken by the burglar.

8. Ms. Mitro informed Ms. Gallo that the alleged burglar had taken an entire dresser drawer from the residence.

9. Ms. Mitro's husband advised Officer Chappelle that his family removed all the valuable items from the home before the alleged burglary because they were going to sell the home.

10. Officer Chappelle reported that there were no signs of forced entry.

11. Ms. Mitro provided Allstate with her own credit card receipts never mentioning that they were not the insured's receipts.

12. Ms. Mitro's receipts demonstrated returns[,] not purchases.

13. Unexpectedly, Ms. Mitro submitted an estimated loss in excess of $12,000.00.

(Trial Ct. Op. at 8 n. 5) (citations omitted). Further, Appellant refused to provide Allstate with a sworn proof of loss statement or submit to an Examination under Oath.

8. Specifically, the plaintiff claimed that the defendant withheld material documents, raised unsupportable objections to plaintiff's discovery requests, delayed in producing discoverable material, and failed to adhere to the discovery deadline. *Id.* at \*1, 1999 WL 178367 at \*1.

ed that an action under section 8371 arises from a bad faith breach of a fiduciary or contractual duty owed by the insurer to its insured by virtue of the parties' insurance policy. *Id.* at *3, 1999 WL 178367 at *1. That being so, it is clear that the plaintiff is not entitled to redress under section 8371 since the statute was designed to provide "a remedy for bad-faith conduct by an insurer in its capacity as an insurer and not as a legal adversary in a lawsuit filed against it by an insured." *Id.* at *4, 1999 WL 178367 at *2. The court specifically noted that its holding does not preclude a finding of liability for an insurer's "bad faith conduct arising in the insurer-insured relationship which happens to occur during the pendency of an action, or for initiating an action against an insured in a bad faith effort to evade a duty owed under a policy." *Id.* at *5 n. 3, 1999 WL 178367 at *2 We find this reasoning both applicable and persuasive.

¶ 27 Depositions and written interrogatories are vehicles of discovery utilized in preparation for trial so that a party may clarify the matters at issue. Generally, the matters within the scope of discovery are very broad; however, we note that "[n]o discovery or deposition shall be permitted which . . . is sought in bad faith . . . or would cause unreasonable annoyance, embarrassment, oppression, burden or expense to the deponent or any person or party." Pa.R.C.P. 4011(a), (b). If a party believes it is subject to improper discovery, the Pennsylvania Rules of Civil Procedure provide an exclusive remedy whereby the aggrieved party may file a motion for a protective order. *Id.* at 4012.

¶ 28 Here, Appellant attempts to classify Allstate's discovery requests as bad faith investigatory practices under section 8371. First, Appellant argues that Allstate's written interrogatories requested "frivolous" and irrelevant information regarding the property's roof, foundation, and plumbing, thus further evidencing Allstate's alleged course of bad faith conduct in unreasonably prolonging its investiga-

tion without a denial or acceptance of her claim. We first note, however, that although Appellant now claims that the interrogatories were improper, at no time did she seek a protective order or otherwise object to the sought-after information.

¶ 29 Moreover, Appellant initiated an adversarial action by filing a breach of contract and bad faith action against Allstate for its failure either to refuse or accept her claim following a lengthy investigation. Accordingly, Allstate engaged in the routine discovery process of litigation by propounding interrogatories in preparation for trial on Appellant's issues. It was explained that because this matter involved a burglary, inquiries as to the structure's integrity were set forth to determine how an alleged burglar could have gained entry. (N.T. 2/11/98 at 184). Clearly, given the lack of any evidence indicating forcible entry, the information requested in the interrogatories was within the proper scope of discovery and necessary for Allstate's defense to Appellant's claims. In the absence of any evidence which demonstrates that Allstate was motivated by a dishonest purpose or ill motive, or otherwise breached it fiduciary or contractual duty by utilizing the discovery process to conduct an improper investigation, we must reject Appellant's attempt to equate the propounding of interrogatories with the type of bad faith investigative practices actionable under section 8371. Appellant clearly failed to sustain her burden of proving by clear and convincing evidence that the conduct was improper. Therefore, as a matter of law, we find that Allstate's conduct in this regard was not in bad faith.

¶ 30 Next, Appellant argues that Allstate acted in bad faith when it refused to settle the claim following her deposition. Despite Allstate's request, Appellant refused to submit to an Examination under Oath for purposes of adjusting her loss. Appellant's argument on appeal suggests

that her sworn testimony during deposition should be substituted for an Examination Under Oath, and, therefore, Allstate's failure to settle the claim following its receipt of her sworn testimony constitutes bad faith. We find this argument specious at best.

¶ 31 As stated above, a deposition is a form of discovery conducted in preparation for trial. Under no circumstances was Allstate under an obligation to offer Appellant a settlement following Mitro's deposition. To the contrary, as observed by the trial court, Allstate "deftly employed Ms. Mitro's deposition to expose inconsistencies in plaintiff's claim with Allstate." (Trial Ct. Op. at 4). Under the facts of this case, it is evident that Appellant has failed to describe conduct sufficiently egregious to be considered reckless or otherwise committed with the intent of improperly avoiding payment of her claim. As a result, we refuse to find that Allstate's conduct during the routine process of discovery was in contravention of section 8371.

¶ 32 It is abundantly clear that Allstate's conduct during litigation did not, as a matter of law, rise to the level of bad faith under section 8371. Appellant has utterly failed to present any evidence demonstrating improper investigative tactics or an unreasonable denial of the claim; she has simply not provided enough evidence for a reasonable jury to find by clear and convincing evidence that Allstate acted in bad faith as proscribed by section 8371. As a result, we conclude that the trial court's jury instruction was not fundamentally erroneous, since it properly limited the jury's consideration to that conduct relevant to the bad faith inquiry; in this case, conduct which occurred prior to the commencement of the instant action. *See, e.g., D'Ambrosio,* 494 Pa. at 507, 431 A.2d at 971 (observing that "those jurisdictions which have recognized a cause of action for bad faith conduct have cautioned that '[i]f the claim is 'fairly debatable,' no liability in

tort will arise.' ") (citation omitted); *Horowitz v. Federal Kemper Life Assurance Co.,* 57 F.3d 300, 307 (3d Cir.1995)(interpreting section 8371 and finding no bad faith were insurer had reasonable basis to deny claim); *Jung v. Nationwide Mut. Fire Ins. Co.,* 949 F.Supp. 353, 360 (E.D.Pa.1997)(granting summary judgment on section 8371 bad faith claim, reasoning that in absence of evidence revealing dishonest purpose, it is not bad faith for insurer to aggressively investigate and protect its interests).

¶ 33 Finally, we note that the trial court has thoroughly addressed and adequately disposed of Appellant's remaining issues. Therefore, to that extent, we affirm on the basis of the well-reasoned trial court Opinion.[9]

¶ 34 Judgment affirmed.