**Dr. Ronald B. GREENE and Rochelle Greene, Appellants**

v.

**UNITED SERVICES AUTOMOBILE ASSOCIATION, Appellee.**

Superior Court of Pennsylvania.

Argued June 5, 2007.

Filed Nov. 20, 2007.

Henry J. Lanzalotti, Lansdale, for appellants.

Joseph B. Mayers, Blue Bell, for appellee.

BEFORE: JOYCE *, J., McEWEN, P.J.E. and COLVILLE **, J.

* Judge Joyce did not participate in the consideration or decision of this case.

** Retired Senior Judge assigned to the Superior Court.

OPINION BY COLVILLE, J.:

¶ 1 Appellants, Dr. Ronald B. Greene and Rochelle Greene, appeal from the judgment entered in the Court of Common Pleas of Montgomery County following the denial of their motion for post-trial relief. We affirm.

¶ 2 Appellants filed an action against United Services Automobile Association ("USAA"), claiming breach of contract and bad faith with respect to two claims submitted under their homeowners' insurance policy. Following a nonjury trial, the court awarded Appellants damages in the amount of $3,173.37 for repairs to their home. The court denied Appellants' claim for bad faith damages relating to USAA's handling of their claims. Appellants' motion for post-trial relief subsequently was denied. After the verdict was reduced to judgment, Appellants timely filed a notice of appeal. The trial court then ordered Appellants to comply with Pa.R.A.P. 1925(b), which they did.

¶ 3 Appellants present two issues for our consideration:

I. Whether the following conduct of an insurer constitutes bad faith under 42 Pa.C.S. § 8371:

A. Insurer's admitted failure to properly investigate insured's claim;

B. Insurer's admitted failure to affirm or deny an insured's claims in a reasonable time;

C. Insurer's admitted failure to acknowledge and/or act promptly on an insured's written and telephone communications about its claims;

D. Insurer's failure to adopt and enforce reasonable standards for the conduct of their adjuster with regard to the investigation and payment of an insured's claims; and

E. Insurer's failure to ever provide an explanation of its adjustment of an insured's claim and/or failure to provide a proper and adequate explanation for the adjustment of an insured's claim.

II. Whether an insured is entitled to have its [sic] roof replaced when part of the roof is damaged as a result of a covered loss when matching shingles cannot be obtained and the homeowner's insurance policy provides for "replacement of that part of the building damaged" and for "like construction and use."

Appellants' Brief at 4.

¶ 4 Because this appeal is from an order following a nonjury trial, the following general principles apply to our review:

... Our review in a nonjury case is limited to whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in the application of law. We must grant the court's findings of fact the same weight and effect as the verdict of a jury and, accordingly, may disturb the nonjury verdict only if the court's findings are unsupported by competent evidence or the court committed legal error that affected the outcome of the trial. It is not the role of an appellate court to pass on the credibility of witnesses; hence we will not substitute our judgment for that of the factfinder. Thus, the test we apply is not whether we would have reached the same result on the evidence presented, but rather, after due consideration of the evidence which the trial court found credible, whether the trial court could have reasonably reached its conclusion.

*Hollock v. Erie Insurance Exchange,* 842 A.2d 409, 413–14 (Pa.Super.2004) (en banc) (quotation marks and citations omitted).

¶ 5 Moreover, because Appellants sought but were denied judgment notwithstanding the verdict, the following principles of appellate review also are implicated:

In reviewing a motion for judgment n.o.v., the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor. Moreover, [a] judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. Further, a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations.

There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant[.] With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a verdict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003, 1007 (1992) (citations and quotation marks omitted).

¶ 6 Before we reach the merits of Appellants' issues, we will restate the findings of fact as provided by the trial court.

The trial evidence established that [Appellants'] initial loss occurred in November of 1998, but was not reported until December 19, 1998, due to [Dr. Greene's] illness. On that date, Dr. Green[e] spoke to USAA claims representative Frances Meeks wherein he indicated that water had leaked heavily into the children's [bathroom] through the skylights. Dr. Green[e] also indicated that the roof had been inspected and that the roofer determined that the flashing around the skylight was cracked. Mrs. Meeks informed Dr. Green[e] that there was no coverage for the skylight and requested further pictures and an estimate of the claimed loss. On January 27, 1998, Ms. Meeks called [Appellants] because she had not yet received the requested estimates. And, on February 2, 1999, [Appellants] faxed Ms. Meeks an estimate for roof repair only in the amount of $1,125.00.

Due to a question about the coverage for the exterior damages, Ms. Meeks assigned an outside field adjuster to [Appellants'] claim, namely, William McNamara. On February 8, 1999, Mr. McNamara made an appointment to inspect [Appellants'] home on February 9, 1999. At the meeting, Mr. McNamara inspected [Appellants'] bathroom and inspected the roof from his position on the ground. He also photographed the premises. Mr. McNamara testified that, at the initial inspection, he advised Mrs. Greene that USAA would not provide coverage for wear and tear of the roof.

Between February 9, 1999, and March 28, 1999, Mr. McNamara made several attempts to contact [Appellants'] roofer, Russell Roofing, and [Appellants'] contractor for the bathroom, George Stoulis Design Associates. During that time frame, a representative from Russell

Roofing, Mr. Biel, informed Mr. McNamara that [Appellants'] roof showed evidence of wear and tear, and possible storm damage, in *the form of three (3) missing shingles*. Mr. McNamara also received the bathroom repair estimate for a total amount of $1,065.00 from Stoulis Design.

On March 28, 1999, Mr. McNamara approved the issuance of payment to [Appellants] in the amount of $855.92 ($1,065 for the Stoulis estimate; $290.92 for minimal roof repairs, minus the deductible of $500.00).

In the meantime, on March 22, [1999], [Appellants] submitted an additional, independent, claim for water damage to their bathroom as a result of wind and storm damage. In this report, Dr. Greene stated that a tree fell, damaged his roof, broke a seal around the upstairs window and knocked many shingles off the roof. He also alleged that rain water flooded the upstairs [bathroom].

Please note, the aforementioned new damage allegedly occurred around the time that the Greenes were informed that USAA would not cover wear and tear on their eighteen (18) year old roof. Also on March 25, 1999, [Dr. Greene] sent correspondence relating to this second claim generically addressed "Dear USAA." He did this despite being assigned to a claims representative, Mr. Rodriguez, and/or, despite his previous communications with, claims adjuster, Mr. McNamara. In this March 25, 1999

letter, [Dr. Greene] asserts that Russell Roofing will provide information indicating that the entire roof must be replaced because the present shingles are no longer manufactured.

On April 8, 1999, USAA (San Antonio office) received an estimate dated February 23, 1999, from Russell Roofing for $18,887.00 for replacement of [Appellants'] entire roof.[1] Also, on that date, USAA received an estimate from T & C Construction for $1200 to repair [Appellants'] bathroom.

On April 9, 1999, [Appellants'] second claim was assigned to claims adjuster, William McNamara. At that time Mr. McNamara reviewed the Greenes' policy and claim documentation and left a message on [Dr.] Greene's answering machine. The message went unanswered, and on April 12, 1999, Mr. McNamara left another message for the Greenes. Finally, on April 14, 1999, Mr. McNamara spoke with Dr. Greene and made arrangements to meet the Greenes' contractor at the house that day at 11:00 a.m.

On April 14, 1999, when Mr. McNamara presented for inspection, he immediately noticed that the Greenes' **entire** roof had been replaced. Because the roof had been replace[d] prior to USAA's inspection, Mr. McNamara was unable to inspect the same relative to the second March 1999 loss. Further, evidence showed that Russell Roofing began work on the roof at the end of March or

1. The trial court refers to a roofing estimate dated February 23, 1999. The February 23rd document is actually a statement reflecting the cost of reroofing the home and acknowledging the $6,000 deposit made on February 16, 1999. *See* Plaintiffs' Exhibit 6. We note that Plaintiffs' Exhibit 5 was the proposal for re-roofing Appellants' entire home and for installing a ventilation system. This proposal was dated February 15, 1999. The document reflects that the proposal was accepted by Dr. Greene on February 16, 1999, approximately one month before Appellants experienced the second incident involving damage to their roof. As indicated by the trial court, and as reflected on the Property Loss Report signed by Dr. Greene on March 29, 1999, the second loss occurred on March 22, 1999. *See* Plaintiffs' Exhibit 13.

beginning of April, and completed the work by April 7–9, 1999.

Thus, based on the foregoing, the evidence showed that the Greenes began replacing their roof at the end of March or beginning of April, prior to having submitted the $18,887.00 estimate to their insurance company. Indeed, evidence showed that [Appellants] began replacing their entire roof within days that they signed and dated the Property Loss Report, but prior to USAA's receipt of the same.

Further, at the April 14, 1999 inspection, Mr. McNamara spoke with a contractor who was working on the bathroom. At that point, Mr. McNamara observed that the bathroom had not yet been repaired from the November 1998 claim. He also informed the contractor that the amount that he had previously allowed for repairs appeared sufficient to cover any of the alleged new damage.

On April 26, 1999, Dr. Greene wrote a letter to Mr. McNamara stating that he wanted a breakdown for the check issued for $855.[92] and that he [had] photographs of the roof showing the March 1999 loss.

At trial, Mr. McNamara admitted that he did not respond to the [Appellants'] April 26, 1999 letter, nor did he respond to subsequent messages left by Dr. Greene. Mr. McNamara asserted that, at that particular time, he was not as diligent about working his files, due to the poor health of his mother.

On June 1, 1999, Dr. Greene wrote another letter to Mr. McNamara whereby Mr. McNamara called Dr. Greene and arranged a meeting for Saturday, June 11, 1999, at the residence. At this meeting, Mr. McNamara explained the breakdown for USAA's check in the amount of $855.[92] for the November 1998 loss. He further explained that USAA would not issue payment for the upstairs bathroom as a result of the March 1999 claims because the repairs had never been accomplished for the prior loss. Mr. McNamara further indicated that USAA's previous payment for the interior damage was adequate to cover any additional damage which might have occurred.

Also at the June 1, 1999 meeting, Dr. Greene presented pictures of the roof damage, whereby, Mr. McNamara explained that USAA would not cover replacement of the entire roof; USAA was only responsible for that portion of the roof that was actually damaged. Upon Dr. Greene's insistence, Mr. McNamara agreed to further discuss the roof coverage with his manager. Significantly, at trial, Mr. Biel from Russell Roofing testified that the roof photographs showed no evidence of storm damage.

As promised, Mr. McNamara discussed the foregoing with two (2) USAA managers and had the photographs reviewed by a general adjuster. Thereafter, Mr. McNamara issued the following August 13, 1999 letter to [Dr.] Greene advising him of USAA's coverage decision.

> "After my opportunity to inspect your roof with you, I met with my manager and his manager. The photos and estimate, which you submitted, were reviewed. Based on the policy language of direct physical loss, they determined that the only covered portion of the roofer's estimate is to the front slope of the roof. I further had the photos reviewed by a general adjuster from USAA. He also confirmed the scope of coverage damage [to be] limited to the front slope of your roof.
>
> Enclosed please find an estimate that reflects the necessary work to the front slope."

The aforementioned four (4) page estimate clearly identified the amounts that USAA would cover as a result of the claim, namely, $1908.37 minus [Appellants'] $500.00 deductible for a total distribution of $1,434.54.[2] When Mr. McNamara issued this letter, however, he failed to issue the corresponding check.

Thereafter, when Mr. McNamara reviewed the Greene file in order to close it out, he observed that the aforementioned check had never been issued. Consequently, on March 17, 2000, Mr. McNamara issued the same.

Trial Court Opinion, 2/23/07, at 3–6 (emphasis in original and references to the record omitted).

 ¶ 7 We will address Appellants' second issue first. Under this issue, Appellants point out that their homeowners' insurance policy required USAA to provide the replacement cost of the part of the building which was damaged and that the replacement cost shall not exceed that which is necessary for the like construction and use. According to Appellants, the part of the building damaged was the roof of their house, and because the damaged shingles on their home were no longer in production, like construction meant an entirely new roof, not a roof with mismatched shingles. Appellants claim that their homeowners' insurance policy clearly obligates USAA to pay for the replacement of their entire roof and that the trial court erred in concluding otherwise, despite the fact that the sum of the damage from both incidents involved only one slope of the twelve slopes of their roof.

¶ 8 Resolution of this issue requires that we interpret Appellants' homeowners' insurance policy. "As the interpretation of

an insurance contract is a question of law, our standard of review is *de novo;* thus, we need not defer to the findings of the lower tribunals. Our scope of review, to the extent necessary to resolve the legal question before us, is plenary." *401 Fourth St., Inc. v. Investors Insurance Group*, 583 Pa. 445, 879 A.2d 166, 170 (2005).

¶ 9 The law in this area is well-settled: The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury. The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy. When the language of the policy is clear and unambiguous, a court is required to give effect to that language. When a provision in a policy is ambiguous, however, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage. Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. Finally, [i]n determining what the parties intended by their contract, the law must look to what they clearly expressed. Courts in interpreting a contract, do not assume that its language was chosen carelessly. Thus, we will not consider merely individual terms utilized in the insurance contract, but the entire insurance provision to ascertain the intent of the parties.

*Id.* at 171.

¶ 10 The pertinent provision of Appellants' homeowners' insurance policy reads as follows:

---

**2.** The sum of $1,908.37 included materials in the amount of $436.15 plus $26.17 in sales tax. The net exterior claim, after subtracting

Appellants' $500 deductible, was $1,434.54. *See* Appellants' Exhibit 21.

If, at the time of the loss, the amount of the insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of the deductible and without deduction for depreciation, but not more than the least of the following amounts:

(1) the limit of liability under this policy that applies to the building;

(2) the replacement cost of that part of the building damaged; or

(3) the necessary amount actually spent to repair or replace the damaged building.

The replacement cost will not exceed that necessary for the like construction and use on the same premises; regardless of whether the replacement building is located on the same or different premises.

Appellants' Complaint, 3/27/03, Exhibit A, at 2.

¶ 11 The policy clearly and unambiguously requires USAA to pay the replacement cost of the part of the building damaged. As noted above, Appellants contend that this policy language requires USAA to pay for the cost of replacing their entire roof because the roof was the "part of the building damaged." We find this interpretation of the policy language to be unreasonable and absurd. At most, the "part of the building damaged" in this case was one slope of Appellants' multi-sloped roof.[3] The trial court succinctly highlighted the absurdity of Appellants' argument when the court stated, "To utilize [Appellants'] logic would necessitate replacing all siding when one piece of siding is damaged, or an entire door when a door knob is damaged. It defies common sense." Trial Court Opinion, 2/23/07, at 8.

 ¶ 12 Appellants' argument regarding the policy's "like construction" language equally is unavailing. Although the exact shingles that were damaged as a result of the two incidents were no longer available, testimony at trial revealed that shingles of similar color and texture were available and that these shingles could have been used to repair the damaged slope of Appellants' roof.[4] N.T., 4/7/05, at 191, 199, 217–18. The policy clearly and unambiguously provides for "like construction," not replacement with the identical item damaged. We are satisfied that the repair of the damaged slope of Appellants' roof with shingles similar to the damaged shingles in function, color, and shape meets the parameters of "like construction" as called for by the policy language. For these reasons, we conclude the trial court properly determined that Appellants' homeowners' insurance policy did not re-

---

**3.** We point out that there appears to be an inconsistency between the trial court's order and the court's opinion regarding Appellant's second claim. In its opinion, the trial court simply stated that Appellants "are not entitled to coverage for that roof damage because [Appellants] did not allow USAA to examine that underlying loss prior to replacing the same. Thus, there was no way for USAA to determine the extent of damage caused in the alleged second claim." Trial Court Opinion, 2/23/07, at 8. However, in its order, the trial court clearly awarded Appellant damages stemming from the second claim. *See* Trial Court Order, 1/27/06, at ¶ c. ("Further, [USAA shall pay Appellants] in the amount of $1,908.37 minus deductible, for replacement of front slope of [Appellants'] roof.").

**4.** Despite Dr. Greene's protestations at the prospect of having a two-toned roof, the vice-president of the roofing company that prepared the repair estimate, and later replaced the roof, noted that the original shingles, even if still available, would not have matched Appellants' roof, due to discoloration from the aging of the roof, as well as algae, moss, and mold present on the eighteen-year-old roof. N.T., 4/7/05, at 199–201.

quire USAA to pay for the replacement of Appellants' entire roof.

¶ 13 Under their first issue, Appellants assert error stemming from the trial court's denial of their bad faith claims. Appellants brought their bad faith claims pursuant to 42 Pa.C.S.A. § 8371, which states:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371.

¶ 14 Based upon the findings of fact quoted above, the trial court made the following legal conclusions regarding Appellants' bad faith claims:

As fact finder, we were not convinced, by clear and convincing evidence that USAA acted in bad faith, or with dishonest purpose, ill-will, or self interest. At most, the above evidence indicates that Mr. McNamara failed to respond to one letter, and return a few of [Appellants'] phone calls. And while it is clear that Mr. McNamara's [sic] failed to issue the last coverage check for eight (8) months, we view such inaction as inadvertence rather than an act of ill will. The facts divulged a convoluted procedural history involving unreturned correspondence from [Appellants] as well as from [USAA]. The facts also demonstrated suspect actions on the part of [Appellants] in order to get their eighteen (18) year old roof replaced in its entirety. These actions include [Appellants'] replacement of the entire roof prior to submitting the estimate to USAA, and [Appellants] failure to repair the interior damage from the first claim, despite payment. All of these combined facts lead us to the conclusion, as fact finder, that [Appellants] failed to meet their heavy burden of clear and convincing evidence in proving their bad faith claim against USAA.

Trial Court Opinion, 2/23/07, at 6–7.

¶ 15 In their appellate brief, Appellants contend the trial court erred in failing to award them damages due to USAA's alleged bad faith in the handling of their claims. The cornerstone of Appellants' argument is that the trial court "misinterpreted the law to require intentional conduct such as a dishonest purpose, motive of self-interest or ill will." Appellants' Brief at 22. This argument raises a question of law. Accordingly, as with all questions of law, our standard of review is *de novo*, and our scope of review, to the extent necessary to resolve the legal question before us, is plenary. *401 Fourth St., Inc.*, 879 A.2d at 170.

¶ 16 We begin our analysis by noting that the legislature did not provide a definition of bad faith as that term is used in 42 Pa.C.S.A. § 8371, nor did the legislature set out the manner in which a party must prove bad faith. Moreover, our Supreme Court has yet to address these issues. This Court, however, has set forth the law in this area as follows:

"[S]ection 8371 is not restricted to an insurer's bad faith in denying a claim. An action for bad faith may [also] extend to the insurer's investigative practices." *O'Donnell v. Allstate Insurance Company*, 734 A.2d 901, 906 (Pa.Super.1999). Although the bad faith statute does not include a definition of "bad faith," the

term encompasses a wide variety of objectionable conduct, as described by a panel of this Court in [*Brown v. Progressive Insurance Co.*, 860 A.2d 493 (Pa.Super.2004) ]:

> For example, bad faith exists where "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." [*O'Donnell*, 734 A.2d at 906] ...; *see also, Terletsky v. Prudential Prop. And Cas. Ins. Co.*, 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (bad faith is a frivolous or unfounded refusal to pay the proceeds of a policy done with dishonest purpose, motivated by self-interest or ill will). Bad faith conduct also includes "lack of good faith investigation into facts, and failure to communicate with the claimant." [*Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228, 1232 (1994) ]; *see also, [The Birth Center v. The St. Paul Cos.*, [567 Pa. 386] 787 A.2d 376, 378 (Pa.2001) ] (upholding a finding of bad faith where the insurer intransigently refused to settle a claim that could have been settled within policy limits, where the insurer lacked a bona fide belief that it had a good possibility of winning at trial, thus resulting in a large damage award at trial); *O'Donnell*, 734 A.2d at 906 (bad faith "may also extend to the insurer's investigative practices").

> Recently, in *Hollock v. Erie Ins. Exch.*, 2004 PA Super 13, 842 A.2d 409 (Pa.Super.2004), this Court upheld a trial court's finding of bad faith where well-documented evidence at trial established that the insurer misrepresented the amount of coverage, arbitrarily refused to accept evidence of causation, secretly placed the insured under surveillance, acted in a dilatory manner, and forced the insured into arbitration by presenting an arbitrary "low-ball" offer which bore no reasonable relationship to the insured's reasonable medical expenses, and which proved to be 29 times lower than the eventual arbitration award.

> On the other hand, our Courts have not recognized bad faith where the insurer makes a low but reasonable estimate of the insured's losses, or where the insurer made a reasonable legal conclusion based on an area of the law that is uncertain or in flux. *Terletsky*, 649 A.2d at 688–689; *see also, O'Donnell*, 734 A.2d at 910 (in the absence of evidence of a dishonest purpose or ill-will, it is not bad faith to take a stand with a reasonable basis or to "aggressively investigate and protect its interests" in the normal course of litigation).

> To constitute bad faith, it is not necessary that the insurer's conduct be fraudulent. However, mere negligence or bad judgment is not bad faith. To support a finding of bad faith, the insurer's conduct must be such as to "import a dishonest purpose." In other words, the plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill-will. Bad faith must be shown by clear and convincing evidence.

*Brown*, 860 A.2d at 500–501 (some internal citations omitted). To prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim. [*Terletsky*, 649 A.2d at 688]. Bad faith claims are fact specific and

depend on the conduct of the insurer *vis à vis* the insured. *Williams v. Nationwide Mutual Ins. Co.*, 750 A.2d 881, 887 (Pa.Super.2000).

*Condio v. Erie Insurance Exchange*, 899 A.2d 1136, 1142–43 (Pa.Super.2006).

▮▮▮▮ ¶ 17 It is clear from the above that, in order for a party to succeed on a statutory claim of bad faith, that party must fulfill a two-prong test, *i.e.*, "To prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Id.* at 1143. However, as this Court noted in *Condio* and in many other cases, in order to prove bad faith, a party "must show that the insurer breached its duty of good faith through some motive of self-interest or ill-will." *Id.*

▮▮▮ ¶ 18 No court from this Commonwealth has discussed the relationship between the two-prong test and the seemingly additional requirement of proving a motive of self-interest or ill-will. Our research, however, has uncovered a recent decision from the United States District Court for the Western District of Pennsylvania in which that court discussed this relationship. That court stated as follows:

> Although [42 Pa.C.S.A. § 8371] does not define the term "bad faith," the Pennsylvania Superior Court in [*Terletsky* ] set forth two elements necessary to prove a section 8371 bad faith claim:
>
> (1) the insurer did not have a reasonable basis for denying benefits under the applicable insurance policy; and
>
> (2) the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.

*Id.* at 688.

There is a requisite level of culpability associated with a finding of bad faith. Merely negligent conduct, however harmful to the interests of the insured, is recognized by Pennsylvania courts to be categorically below the threshold required for a showing of bad faith. [*Brown*, 860 A.2d at 501]. "Bad faith claims are fact specific and depend on the conduct of the insurer *vis a vis* the insured." [*Condio*, 899 A.2d at 1143 (quoting *Williams*, 750 A.2d at 887) ]. In *Klinger v. State Farm Automobile Insurance Co.*, 115 F.3d 230 (3d Cir. 1997), the United States Court of Appeals for the Third Circuit concluded that the Pennsylvania Superior Court in *Terletsky* did not intend to include an element of "self-interest or ill-will" within the test for establishing bad faith. *Id.* at 233–34. The court of appeals determined that the superior court in *Terletsky* had not applied this "third element." *Id.* Subsequent to *Klinger*, the superior court stated:

> [O]ur Court has adopted the following definition of "bad faith" as applicable in the context of insurance:
>
> "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

[*O'Donnell*, 734 A.2d at 905] (internal quote from BLACK'S LAW DICTIONARY 139 (6th ed.1990)).

While it is true that there is no "third element" applicable to a bad faith claim, "motive of self-interest or ill will" as

recognized in *O'Donnell* reflects upon whether a refusal to pay benefits is frivolous or unfounded. The superior court in *O'Donnell* stated:

> Generally, success in bringing a claim of bad faith requires the insured to present clear and convincing evidence that "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim."

*Id.* (quoting *MGA Ins. Co. v. Bakos,* 699 A.2d 751, 754 (Pa.Super.Ct.1997)). A "motive of self-interest or ill will" may be considered in determining whether an accused *knowingly* or recklessly disregarded its lack of a reasonable basis for denying a claim. The court of appeals' characterization in *Klinger* of a "motive of self-interest or ill will" as an inapplicable "third element" needs to be understood in the context of Pennsylvania courts not requiring proof of self-interest or ill will as a separate element, but rather to support a finding of a frivolous or unfounded refusal to pay. *See Hollock v. Erie Ins. Exchange,* 588 Pa. 231, 903 A.2d 1185, 1187 n. 1 (2006) (Cappy, C.J., dissenting) ("Although this Court has not spoken to the definition of 'bad faith' the Superior Court has consistently held that bad faith under the statute is established on a showing that the insurer breached its duty to act in good faith and fair dealing with its insured by any frivolous or unfounded refusal to pay the policy through some motive of self-interest or ill will."); *Brown,* 860 A.2d at 501 ("In other words, the plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill will."); *Bonenberger v. Nationwide Mutual Ins. Co.,* 791 A.2d 378, 380 (Pa.Super.Ct.2002) ("It also must be shown that the insurer breached a known duty (i.e., good faith and fair dealing), through some motive of self interest or ill will.").

In situations where the Pennsylvania Supreme Court has not ruled on a particular issue of Pennsylvania law, district courts in order to apply Pennsylvania law need to predict how the supreme court would rule on the issue. *Wirth v. Aetna U.S. Healthcare,* 469 F.3d 305, 309 (3d Cir.2006). In making that prediction district courts may be informed by decisions of Pennsylvania lower courts. *Dilworth v. Metropolitan Life Ins. Co.,* 418 F.3d 345, 349 (3d Cir.2005). Here, the court predicts that the Supreme Court of Pennsylvania will rule consistently with the holdings of the Pennsylvania Superior Court concerning the level of culpability that needs to be associated with a finding of bad faith. The court of appeals in *Klinger* did not find that a motive of self-interest or ill will was irrelevant in determining "bad faith." To the extent that *Klinger* holds that there is no "third element" for purposes of a bad faith claim, the reasoning of the court of appeals is consistent with a conclusion that considerations of "the motive or self-interest or ill will" are probative with respect to a refusal to pay being frivolous or unfounded. This court concludes that the "motive of self-interest or ill will" level of culpability is not a third element required for a finding of bad faith, but is probative of the second element identified in *Terletsky,* i.e., "the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Terletsky,* 649 A.2d at 688.

*Employers Mutual Casualty Company v. Loos,* 476 F.Supp.2d 478, 490–91 (W.D.Pa. 2007) (emphasis in original).

¶ 19 We find this discussion to be well-informed and persuasive. We, therefore, adopt this rationale. More specifically, we hold that the "motive of self-interest or ill will" level of culpability is not a third element required for a finding of bad faith, but it is probative of the second element identified in *Terletsky*, *i.e.*, "the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Terletsky*, 649 A.2d at 688.

¶ 20 As stated above, the trial court *sub judice* concluded that, based upon the evidence presented, USAA did not act with a motive of self-interest or ill-will. After review of the record, we agree with this assessment. As such, the trial court did not err by rejecting Appellants' claims that USAA acted in bad faith in the investigation and settlement of Appellants' claims.

¶ 21 For these reasons, we affirm the judgment.

¶ 22 Judgment affirmed.